## NEW YORK LIFE INS. CO. v. McCURDY.
### No. 1836.

Circuit Court of Appeals, Tenth Circuit.
Aug. 10, 1939.

Rehearing Denied Sept. 25, 1939.

BRATTON, Circuit Judge, dissenting.

W. A. Kahrs and Austin M. Cowan, both of Wichita, Kan. (C. A. McCorkle and Robert H. Nelson, both of Wichita, Kan., and Louis H. Cooke, of New York City, on the brief), for appellant.

John F. Eberhardt, of Wichita, Kan. (J. B. McKay, of El Dorado, Kan., and Robert C. Foulston and George Siefkin, both of Wichita, Kan., on the brief), for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

This is an action to recover on a $5,000 policy of life insurance issued on April 2, 1937, to Robert A. McCurdy, and designating Sarah M. McCurdy as beneficiary. It was commenced in the District Court of Butler County, Kansas, on March 25, 1938 by Sarah M. McCurdy as plaintiff against the New York Life Insurance Company as defendant. In due course it was removed to the United States District Court. The parties will be referred to as they appeared in the trial court.

The uncontroverted evidence showed that the cancer (carcinoma) from which Robert A. McCurdy died on December 15, 1937, had its origin in the right testicle. In the application for the insurance the applicant was required to advise the insurance company whether he had ever been *under observation* or *treatment in any hospital* or *sanitarium by any physicians,* and to give the names of each of such physicians whom he had consulted for any ailment or disease and the *names of any physicians whom he had consulted* or *by whom he had been examined* or *treated within five years last past.*

The defendant claimed that he answered these questions falsely in that he failed to set out that in the latter part of September and early part of October, 1933, he had been in the city hospital at Cleveland, Ohio, for a period of approximately ten days; that he had consulted Dr. James J. Joelson of Cleveland, Ohio, a physician, in November of 1935, with regard to trouble with the right testicle; that various tests were made by him with regard to it; that he consulted a specialist, Dr. Lower, in 1935 for the same trouble; that he was a patient in the Lakeside Hospital at Cleveland in 1936 for a period of fourteen days and consulted Dr. Williams with reference to the swelling of the right testicle during that period; that he also consulted Dr. Frank J. Geib, a physician, during that period for the same trouble; that in October, 1936, he was still having trouble with his right testicle which was causing him pain, and that the names of none of these physicians were mentioned by him in the application.

In the written application made on March 10, 1937, by deceased Robert A. McCurdy, for the insurance policy on which this action was based, among the questions asked were the following, to be answered "Yes" or "No" and if the answer to any query was "Yes" the applicant was to give date, details and results and, if within five years, name and address of every physician consulted. See footnote 1 as to questions and answers and statement of facts in detail.

At the close of introduction of all the evidence the defendant submitted its writ-

1 "7. A. Have you ever had any accident or injury or undergone any surgical operation? Yes.

"B. Have you ever been under observation or treatment in any hospital, asylum or sanitarium? Yes.

"A.-B. Appendectomy in Oct. 1936. Clean case. In Allen Hospital, El Dorado, Ks. C. E. Boudreau, M. D.

"C. Has albumin or sugar ever been found in your urine? No.

"D. Have you ever been found to have a high blood pressure? No.

"E. Have you ever raised or spat blood? No.

"F. Have you gained or lost in weight in the last year? No.

"8. Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of

"A. The Brain or Nervous System? No.

"B. The Heart, Blood Vessels or Lungs? No.

"C. The Stomach or Intestines, Liver, Kidneys or Bladder? No, except 7-A.

"D. The Skin, Middle Ear or Eyes? No.

"9. Have you ever had Rheumatism, Gout or Syphilis? No.

"10. Have you ever consulted a physician or practitioner for any ailment or disease not included in your above answers? No.

"11. What physicians or practitioners, if any, not named above, have you con-

ten motion for a directed verdict which was by the court overruled, and exception duly saved.

The jury afterwards returned in open court a verdict against defendant for the full amount claimed. Motion for a new trial and to set aside the verdict and for judgment in its favor was duly filed and presented, which was overruled and exceptions saved.

sulted or been examined or treated by within the past five years? Dr. Rohm, Cleveland, Ohio. Cold—Ill 10 days. Recovery."

The defendant relied upon the written application made by the said Robert A. McCurdy and issued said policy on April 2, 1937. After his death the defendant tendered to the beneficiary (plaintiff) under said policy the premium paid totaling $134.22 and refused to pay the amount of the policy to the beneficiary (plaintiff) for the reason that the said policy was obtained through fraud and concealment.

The undisputed evidence in the case showed that the answers to 11 (eleven) as well as 10 (ten) hereinbefore set out were false and untrue and were known to be false by the said Robert A. McCurdy when the application was signed by him; that the answers were not only false and untrue but were also incomplete, and did not set out the true facts concerning the past condition of the said Robert A. McCurdy. He had been suffering for over two years with pain, tenderness, and swelling of the right testicle which information he did not divulge in his application. He had within five years been attended by many other physicians which information he did not disclose in answer to question No. 11 in the application or otherwise.

Robert A. McCurdy who was also known as "Robert Allen McCurdy," attended the Medical School at the University of Kansas, interned at Kansas City, Missouri, and afterwards went to Cleveland, Ohio, as an intern at the City Hospital. Dr. McCurdy was a patient and assigned to a room in the said City Hospital between September 26, 1933 and October 6, 1933, suffering from an acute sinusitis and an upper respiratory infection. X-rays of the chest and the sinuses were taken as a matter of precaution. He was attended at that time by Dr. Sidney E. Wolpaw, a physician, who was then connected with the said hospital.

Dr. McCurdy in 1934 or 1935 became associated with the University Hospital in Cleveland, and in November 1935 went to Dr. James J. Joelson of Cleveland, Ohio, for medical treatment and advice, at which time he had a small tender lump in the epididymis of his right testicle, Dr. McCurdy being a little concerned about it, Dr. Joelson assured him that it was nothing but a non-specific inflammatory reaction. In order to rule out anything of the nature of a tumor Dr. Joelson did special tests known as the Friedman test as to his urine, which were negative. Dr. Joelson testified that Dr. McCurdy was a doctor and was quite concerned about his condition. According to Dr. Joelson, the testicle itself was perfectly normal, the inflammatory lesion was small and limited to the epididymis which is a small structure just behind the testicle. The epididymis terminates in the tube known as the vas deferens, which goes up into the body and carries the sperm from the testicle. Dr. Joelson took a look at the testicle every four or six weeks after the examination in 1935 until Dr. Robert A. McCurdy left the hospital in July, 1936. During this period Dr. McCurdy had several recurring attacks of pain and Dr. Joelson advised him to take it easy and to forget about it, that it was of no importance. He told him not to get it in his head that he had a cancer. Dr. Joelson made tests on November 27, 1935, March 13, 1936, June 9, 1936, and June 13, 1936, to determine if Dr. McCurdy was suffering from carcinoma (cancer) of the testicle, the tests being all negative. While it was the doctor's opinion that with that type of tumor from which Dr. McCurdy died, there would have been a positive test had he been suffering from the tumor when the tests were made, yet the doctor testified that the only conclusive tests for determining whether a cancer existed was by taking a cross section of the tissue and examining it under a microscope. This was not then done.

After such examination, Dr. Robert A. McCurdy, the deceased, was taken by Dr. Joelson to see a specialist by the name of Dr. Lower. Examination was made by him as to the testicle at the Cleveland Clinic in the summer or autumn of 1935. Dr. Lower found that Dr. McCurdy had a small lump in the right testicle. It was not especially tender and was fairly well circumscribed. Dr. Lower was of the opinion at the time that it was a low grade inflammatory condition and did not believe it malignant at the time of his examination. The testicle at that time was about the size of a filbert, no glands involved, and the cord not being specially thickened. It did not appear to have the firmness often found in definite tumors of the region.

Dr. Harley A. Williams became ac-

As to the physicians who examined Dr. Robert Allen McCurdy, it is shown beyond controversy that Dr. James J. Joelson in 1935 made several tests known as the Friedman and Aschheim Zondek tests to determine if Dr. McCurdy was suffering from quainted with Dr. McCurdy sometime prior to July, 1935, when Dr. McCurdy came to the Lakeside Hospital in Cleveland as a resident physician. Dr. McCurdy was attended by him in June of 1936 in said hospital where Dr. McCurdy was confined in bed for observation. At that time he was under the care of Dr. Frank J. Geib. An examination by Dr. Harley A. Williams of Dr. McCurdy disclosed that his right testicle was somewhat tense and exquisitely tender. The tubules along the side of the testicle showed a little swollen area that could be palpated. The doctor's record shows that Dr. McCurdy was suffering from pain in the right testicle. Dr. McCurdy was being treated as to the testicle at that time. The scrotum was suspended to take the pull and weight off of it, the sack containing the testicles being elevated and ice compresses applied. The swelling and tenderness diminished with bed rest and inactivity. Dr. Williams diagnosed Dr. McCurdy's condition as nonspecific epididymis, right side, and allowed the diagnosis of Dr. Geib of latent undulant fever, being no trivial disease, to stand as Dr. Geib was so confident of it. Dr. Williams designated the condition as "non-specific" for the reason that he did not know the exact cause; that is, it was not from a specific disease that he could name. He did not know what was causing this inflammatory condition. All the tests then made were negative. Dr. McCurdy remained in the hospital from June 9, 1936, until June 22, 1936, and during that time was constantly treated for the condition of the right testicle from which he was suffering, he being during that time kept under constant observation.

Dr. McCurdy complained to Dr. Geib of a slight pain in his right testicle and advised him that he had had previous trouble with the testicle. Dr. Geib, who had no specialty except diagnosis, examined Dr. McCurdy more thoroughly at the hospital and found that he had a swollen testicle. He made a tuberculosis test which was negative. Dr. McCurdy told Dr. Geib that he had previously been examined and diagnosed as having tuberculosis of the testicle. While in the hospital he gave Dr. McCurdy vaccine for undulant fever and the testicle was raised with an ice pack and suspended. Dr. McCurdy told him that he had been told that it might be possible that he was suffering from carcinoma (cancer) of the testicle. He told Dr. Geib that he had been to Dr. Lower, and that Dr. Lower had informed him that it was of a local inflammatory type, which was not carcinoma, but Dr. McCurdy did tell him that some doctors had told him that in their opinion it might be carcinoma. Dr. Geib stated in his deposition that he did not know of any tests that could be made for carcinoma. Carcinoma is a malignant tumor growth and cancer is the common name given. In Dr. Geib's opinion Dr. McCurdy did not have a cancer at that time because the testicle subsided in its swelling. If he had had cancer the treatment that Dr. Geib gave him, according to the doctor, would not have reduced the swelling. The Friedman and Aschheim Zondek tests were made when Dr. McCurdy was in the hospital to determine if there was an excitement of the tissues, which was abnormal. The Aschheim Zondek and Friedman tests are also the pregnancy tests also. The Aschheim Zondek and Friedman tests are not certain by any means. As a rule in medicine a positive test is the only test that really counts; and according to the doctor, a negative test means nothing.

Following his hospitalization from June 9, 1936, to June 22, 1936, Dr. McCurdy moved to El Dorado, Kansas, and started practicing with Dr. C. E. Boudreau and Dr. R. M. Brian. He appeared to be good health but on October 1, 1936, entered the Allen Memorial Hospital at El Dorado for an appendectomy. On or about October 2, 1936, according to Dr. R. M. Brian, who testified in behalf of the plaintiff, Dr. McCurdy complained to Dr. Brian of occasional pains in the right testicle. He said, "My right testicle is aching." Dr. Brian made an examination. Dr. Brian found very little abnormality but the epididymis felt a little indurated. The posterior part felt just a little hard and a little tender and Dr. Brian asked Dr. McCurdy, "How long have you had that?" Dr. McCurdy said, "That thing has been bothering me off and on for two or three years," and Dr. Brian said "What have you done about it?" and Dr. McCurdy said, "Oh, I have been seen by several doctors in Cleveland." Following this conversation and as previously related about five months later to-wit: March 10, 1937, Dr. Robert A. McCurdy made written application for the insurance policy, same being issued April 2, 1937.

In the middle of May, 1937, Dr. McCurdy requested Dr. Brian to examine a small lump on the left side of his neck

carcinoma (cancer) of the testicle. Though but from which Dr. Joelson determined negative, such tests were not conclusive, that no cancer existed. That these tests

just below the collar line and just behind the collar bone. This lump was found to be fairly firm and about the size of a half dollar. Following the appearance of the lump on his neck he sought further medical attention from Dr. Lawrence P. Engel, a surgeon of Kansas City, Missouri, who had become acquainted with Dr. McCurdy when he was a medical student in one of the classes that Dr. Engel taught in the University of Kansas Medical School. He examined Dr. McCurdy in September, 1937, and found that he had a tumor just above the left collar bone about the size of a small hen egg. Dr. McCurdy told Dr. Engel that approximately two years prior to the time of examination he had noticed a small swelling of the right testicle. The swelling on the neck is referred to as nodule or tumor and medically speaking was a chorionic carcinoma. The lump on the neck was removed and the microscopic examination showed it to be a chorionic carcinoma and the only place in which such a growth can arise is in the testicle. From the microscopic examination of this cross section of the nodule it was determined that the carcinoma had its origin in the testicle. The only test for determining if a nodule tumor or growth is malignant is by a microscopic examination of the cross section of the tissue. While there are other tests, they are not certain. It was the doctor's opinion that the testicular swelling suffered by Dr. McCurdy in 1936 was malignant, and that there was a direct connection between the testicular swelling or tumor suffered by Robert A. McCurdy in 1936 and the condition found in September, 1937. Members of the medical profession consider a tumor attached to the testicle or a testicular swelling resulting from an unknown cause, to be a condition demanding close watching and scrutiny and any doctor suffering with such a condition would know that in the end there might be serious consequences. Considering the history of the case, it was Dr. Engel's opinion that the evidence as presented in June, 1936, was in favor of possibly an inflammatory reaction but that subsequent evidence points to the connection between the two. The doctor testified that there was no connection between inflammation and cancer and that a cancer would not respond to ice packs and suspension. However, frequently around the malignant growth there is irritation which produces inflammatory swelling. It was Dr. Engel's opinion that in 1936 there could have

been an inflammatory swelling which subsided to treatment but that did not mean that there was no malignancy at that time. It is true that after the primary growth has spread to other parts of the body death generally comes rather hastily, but on the other hand, if the primary growth had not spread the patient might live indefinitely. This doctor testified that assuming Dr. McCurdy had a cancerous condition of the testicle which would be considered a primary growth, so long as it remained in that portion of the body he might have lived indefinitely.

Following the removal of the nodule on the neck Dr. McCurdy went to New York City for treatment and then was confined to the Temple University, Philadelphia, Pennsylvania Hospital, November 22, 1937, and there attended by Dr. Temple Fay. His case at that time was considered hopeless. When Dr. McCurdy was admitted to the hospital his condition was diagnosed as metastatic carcinoma involving the lungs, liver and probably other areas of the body secondary to a primary lesion of the right testicle. A hard and primary lesion existed in the right testicle as discerned and palpable swelling and physical signs. The right testicle was removed November 29, 1937. The site of beginning of this type of cancer is in the testicle and from there it spreads to other parts of the body. Dr. McCurdy died on December 15, 1937, and the primary cause of his death was chorio carcinoma of the testicle with contributing causes. The cause of death, as given by Dr. Tomlinson, associated with Dr. Temple Fay, was carcinoma of the testicle.

Dr. Joelson was of the opinion that the fact that Dr. McCurdy had a swelling in the testicle in June of 1936 was merely coincident with his death occurring in 1937. In 1936, Dr. Joelson did not believe Dr. McCurdy was suffering from a cancer but he watched the case closely and continued to make tests for cancer. Likewise, Dr. Harley A. Williams and Dr. Frank J. Geib did not believe that Dr. McCurdy was suffering from cancer in 1936. Dr. Lower, while diagnosing Dr. McCurdy's condition in 1935, as a low grade inflammatory condition was of the opinion when his deposition was taken in August, 1938, that he had made a wrong diagnosis and that the condition from which Dr. McCurdy was suffering in 1935 was malignant. This evidence was excluded, from the jury's consideration.

are not certain and that Dr. Joelson was fearful that Dr. McCurdy was suffering from cancer is disclosed by the fact that he continued tests, on to-wit: November 27, 1935, March 13, 1936, June 9, 1936 and June 13, 1936. He also re-examined Dr. McCurdy every four or six weeks from 1935 until the patient left the hospital in July of 1936. Not being satisfied with his own diagnosis in 1935 he took Dr. Mc-Curdy to Dr. Lower for examination and diagnosis. That Dr. McCurdy feared he was suffering from tuberculosis or carcinoma of the testicle is shown by statements made by him to Dr. Frank J. Geib, by whom he was attended, while confined at the Lakeside Hospital in June, 1936, the following conversation taking place:

Dr. Geib as witness:

"Q. You mean he (Dr. McCurdy) had previously been examined and diagnosed as having tuberculosis of the testicle? A. Yes, that's what he told me.

"Q. Doctor, I will ask you if Dr. Mc-Curdy ever advised you that he thought that he was suffering from carcinoma of the testicle? A. He did not say it that way.

"Q. How did he say it? A. He said he had been told that it might possibly be.

"Q. Did he say who told him that? A. No, he did not tell me who told him that, but he said he had been to Dr. Lower and they said it was of the local inflammatory type, which is not carcinoma, of course.

"Q. But he said some doctors had told him that in their opinion it might be carcinoma? A. Yes.

"Q. But he did not tell you who they were? A. No."

Drs. Williams, Geib, Joelson and Lower testified that when they examined and treated Dr. McCurdy during the years 1935 and 1936, they diagnosed the condition as a non-specific inflammatory condition. Non-specific means "cause unknown."

Though Dr. Lower of the Cleveland Clinic testified that in 1935 he was of the opinion that the swelling of the testicle was not of malignant nature, yet he admitted that from the evidence obtained and the knowledge he had concerning the cause of Robert A. McCurdy's death, the nodule or swelling in 1935 must have been malignant. This evidence, however, being objected to by plaintiff, was excluded.

Dr. McCurdy died on December 15, 1937 of carcinoma, a cancer having its origin in the right testicle, which was the testicle subsequently removed in November, 1937, and which caused all the treatments and examinations by the physicians in 1935 and 1936. According to Dr. Engel, cancer may remain in its original site for sometime and it is only after it starts through the body that growing is rapid, which generally results in an early death.

Dr. McCurdy, because of the condition of the testicle, and treatments and examinations that he had had by the physicians, and his treatment at Lakeside Hospital, knew at the time he answered questions No. 7A and 7B and 11 in the application that the said answers were not true and complete, and that he was concealing requested information, though his answers to the questions would be relied on by the defendant company as material in determining as to whether it would accept the risk. The question of intent or good faith or what he believed his condition to be under this record is not here a material issue. He was obliged to disclose in said answers to the defendant the names of the physicians attending him in the past five years and the hospitals where he had been confined.

The Supreme Court of Kansas as well as this court has consistently held that a false representation knowingly made will avoid the policy, even though the untrue answer was made in good faith. If the false answer knowingly made is material, legal fraud results, even though no conscious purpose to deceive exists. Klein v. Farmers' & Bankers' Life Insurance Company, 132 Kan. 748, 297 P. 730, 731; Lodge v. Order of United Commercial Travelers, 125 Kan. 26, 262 P. 598, 600; Steele v. Woodmen of the World, 115 Kan. 159, 222 P. 76; Glasgow v. Woodmen of the World, 107 Kan. 354, 191 P. 470, 472; Hiatt v. Woodmen of the World, 107 Kan. 359, 191 P. 472; Stewart v. American Life Insurance Company, 10 Cir., 89 F.2d 743, 747, 748.

The determination of the insurability of Dr. McCurdy was not to be made by him. The materiality of the question and answers under the record were not matters on which Dr. McCurdy was to pass. The defendant was entitled to have same disclosed in these answers. It was its exclusive prerogative to determine whether it would accept the risk.

Dr. McCurdy agreed in writing as a part of the contract: "On behalf of my-

self and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the company believing them to be true shall rely and act upon them." These answers involved statement of facts within his knowledge independent of opinion and in no way called for exercise of opinion on his part.

With respect to the legal effect of false answers in an application for a policy of life insurance we look to the law relative thereto as declared by the decisions of the highest court of Kansas. Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290; New York Life Ins. Co. v. Jackson, 304 U.S. 261, 58 S.Ct. 871, 82 L.Ed. 1329; Rosenthal v. New York Life Ins. Co., 304 U. S. 263, 58 S.Ct. 874, 82 L.Ed. 1330; and Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

In Scott v. National Reserve Life Insurance Co., 144 Kan. 224, 58 P.2d 1131, decided July 3, 1936, it was held that where proof of alleged fraud becomes conclusive by uncontradicted evidence and written admissions showing falsehood, concealment, and misrepresentations on part of applicant to insurance company, question of existence of fraud becomes matter of law instead of issue of fact for jury.

As to question number 10 in which he was requested to answer whether he had ever consulted a physician for any disease or ailment not included in the foregoing answers, he answered in the negative. He admitted in his answers that he had had measles, mumps, chicken pox, sinusitis and influenza, and that he had had his tonsils and adenoids removed in 1929 and that he had suffered with lumbago in 1933 prior to the removal of an infected tooth, his memory responding as to such minor matters. Interrogatory No. 10 called for an opinion as well as a statement of fact, such interrogatories as called for an expression of opinion, the fact that he committed error in answering the question would not constitute in law fraud. Scott v. National Reserve Life Ins. Co., 144 Kan. 224, 58 P.2d 1131, supra.

Question 11 "What physicians or practitioners, if any, not named above, have you consulted or been treated by within the past five years" called solely for a statement of fact, independent of an opinion, and in no wise for exercise of an opinion.

In Scott v. National Reserve Life Ins. Co., 144 Kan. 224, 58 P.2d 1131, supra, the Supreme Court modified its former[2] opinion and caused judgment to be entered for the defendant, the facts in the case showing that the insured had falsely answered question 6A in that he previously had applied for insurance in another company and had been rejected by it.

In DePee v. National Life & Accident Ins. Co., 144 Kan. 751, 62 P.2d 923, 925, decided December 12, 1936, it is stated: "This court holds that the misrepresentation in De Pee's application touching the nature of his employment was material to the risk and rendered the policy void from its inception."

In National Reserve Life Ins. Co. v. Jeffries, 147 Kan. 16, 75 P.2d 302, decided January 29, 1938, the insurance company sought to cancel a life insurance policy on the ground of fraud committed in securing the policy by the insured in answering questions and misrepresentations as to his health. On appeal judgment was directed by the Supreme Court of Kansas in favor of the insurance company, on account of the insured's fraud in stating in the application that he was then in good health when it appeared by uncontroverted evidence that he had been suffering from hypertension over a period of years. The matter misrepresented having contributed to the contingency or event on which the policy would become due and payable, the misrepresentation was material, and rendered the policy void. Kansas Statutes, 40-418.

In Brown v. Metropolitan Life Ins. Co., 146 Kan. 300, 69 P.2d 1110, 1114, it is said: "We do not deem it necessary to refer to the numerous cases dealing with good faith, mistake as to health, etc., for in this case while the applicant for reinstatement might possibly have believed himself to be in sound health on September 16, 1935, under the undisputed evidence he could not but have known he had had an illness, that he had consulted physicians and that they

---

[2] 143 Kan. 678, 56 P.2d 176.

had diagnosed his trouble as pulmonary congestion with bleeding, and as pulmonary tuberculosis. Those matters having all been shown by the undisputed evidence, the defendant's motion for a directed verdict should have been allowed. Had it been allowed, judgment would . have been rendered against defendant only for the amount of premiums and interest, as tendered into court, and for costs accrued to the time of the tender. (G.S.1935, 60-2936)."

In Jackson v. National Life & Accident Ins. Co., 150 Kan. 86, 90 P.2d 1097, 1098, in application dated January 26, 1937, for issuance of the policy the insured made among other statements the following:

"18. Have you ever had any ailment or disease of:

"(A)—Brain or nervous system? No.

"(B)—Heart or lungs? No.

"(F)—Have you ever consulted a physician for any ailment or disease not included above? No.

"23. State names and addresses of physicians you have ever consulted and give the occasion by reference to question numbers and letters above. None."

The insured had consulted a chiropractor a few months before making said application, who testified that insured consulted him four times in March and several times in April, 1936, and again on March 13, 1937, making complaint of her physical condition; that he made examination and diagnosed the trouble as acute gastritis, and gave. chiropractor's treatments, adjustments and massage on the abdomen. Policy was issued on February 3, 1937, and insured died of myocarditis, the evidence not disclosing or tending to disclose any connection between acute gastritis and myocarditis, or that the gastritis contributed or tended to contribute to the contingency from which she died. The court, commenting on the fact that the insured was not asked in the interrogatory as to whether a chiropractor had been consulted, stated: "While an argument is made that the word 'physician' as used in the application meant 'chiropractor' under our statutes and decisions, still it would not do to presume that the insured thought the one word included the other so as to make her guilty of fraud under the circumstances we have here."

The record not containing any definition as to gastritis, the court held that there was not such showing relative thereto as it could be determined that there was any connection between any character of gastritis and myocarditis, and whether the myocarditis was acute or chronic. There was no contention of illness with gastritis when the policy was delivered.

As to the answer to question (B) that she had not had any ailment or disease of the heart or lungs, the chiropractor testified that insured stated that she had a rapid heart, and he told her that she had a nervous and fast heart. The court comments on the fact that the record does not disclose what is a nervous heart. If she had died from acute myocarditis, the appellate court concluded that same may have arisen after the examination and policy was issued and delivered.

The policy was issued on February 3, 1937, and insured died August 12, 1937. A heart specialist examined her the afternoon of the day before she died. That there was sufficient issue of fact to submit the question to the jury as to whether the insured was in good health at the time the policy was delivered was the holding of the appellate court.

As to the citation therein of Day v. National Reserve Life Ins. Co., 144 Kan. 619, 62 P.2d 925, 929, decided December 12, 1936, opinion by the same judge as in the said Jackson case, the following excerpt is therein contained: "In this answer applicant stated that he had not consulted or been treated by any physician for any ailment not included in the answers to other questions. The record discloses that this answer was literally true. If the matter about which insured consulted a doctor was a disease, it was of the bowels. Hence applicant was correct in his answer. Defendant cites some authorities which hold that where an applicant was asked whether he had consulted a physician and answered in the negative when as a matter of fact he had consulted a physician that this vitiated the policy. These authorities are not in point here because the question in this case was not whether insured had consulted a physician but whether he had consulted a *physician for certain diseases*. The way was left open for an exercise of the good faith and the judgment of the insured." (Italics supplied).

As to the citation also in the Jackson case of Sharrer v. Capital Life Ins. Co., 102 Kan. 650, 171 P. 622, 623, decided

March 9, 1918, as therein stated, examination blank was taken to the insured on September 27, 1915, and the applicant immediately went before Dr. Moses, the examiner, who afterward testified:

"That he did all the writing on the application except the signature. 'Q. After you had written down the answers in this blank, did you read it over to him? A. No, sir. Q. You just passed it to him and asked him to sign it? A. I just passed it to him, and says, "This is what you are to sign," pointing the place where he is to sign. Q. And he signed? A. He signed. * * * Q. Yes; and you say, to all external appearances, at least, or as far as your examination disclosed, he was a healthy man? A. He was a healthy man.' * * *"

The policy came three days later, when the local agent went out as quickly as he could and delivered it at the applicant's home. The appellant claimed that certain answers of *applicant touching his health* relieved it from liability.

The jury found the following facts: "That the deceased consulted one physician June 28 and July 26, 1915, another about August 25th and September 4th * * * but that on September 27th and for two months before he enjoyed good health, and that two months prior to that date he had no sickness," and further that insured was in sound health and insurable condition at the time of the delivery of the policy.

The court (in the Sharrer case) concluded that the jury had fair grounds for finding that the claims as to existing cancer and fraudulent statements were not sustained and that the instructions given to the jury afforded correct rules for guidance in their deliberations.

The case there did not go off on the question "How often during the five years did you consult a physician * * *" (same apparently not being considered in that respect), but upon answer touching the question of "disease of the stomach," which issue of fact was found in favor of insured's beneficiary.

In Klein v. Farmers' & Bankers Life Ins. Co., 132 Kan. 748, 297 P. 730, 731, supra, decided April 11, 1931, in the application the insured stated that he had not consulted a physician in the last ten years. In the opinion it is said: " * * * there is the effect of misrepresentations in his answers to the questions as to whether he had consulted a *physician in the last ten years*. It is shown that, shortly before the application for insurance, Klein had consulted Dr. Sudler of Lawrence and also Dr. Haden of Kansas City. The latter had made an examination, including a blood test, from which he had learned that Klein had pernicious anemia. * * * The fact of the examinations was a material one, and, if it had been answered truthfully, it would have enabled the insurance company to have pursued the inquiry as to what the blood test disclosed, and, if it had learned that the applicant was afflicted with a serious disease, it naturally would have refused to insure him. In the application the applicant had agreed in specific terms that the application should constitute a part of the contract, and that the answers therein were full, complete, and true, and these with the conditions and benefits written therein should be the sole basis of the contracts binding alike on all persons interested under the policy to be issued. Some of the answers were not matters of the belief or opinion of the applicant, but were matters of fact which he well knew and which he answered falsely. The subject of the questions must be conceded to be material. It was incumbent upon the applicant to answer them fairly and truthfully. * * *" (Italics supplied). See, also, Russell v. United Casualty Co., 123 Kan. 282, 255 P. 65.

When fraud is established in obtaining a policy of insurance, there can be no recovery as a matter of law, notwithstanding General Statutes of Kansas, 40-418, which provides: "No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this state, shall be deemed material or render the policy void unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable." Scott v. National Reserve Life Ins. Co., supra; DePee v. National Life & Accident Company, supra; Klein v. Farmers' & Bankers Life Ins. Co., supra; New York Life Ins. Co. v. Hurt, 8 Cir., 35 F.2d 92; Hurt v. New York Life Ins. Co., 10 Cir., 51 F.2d 936; Id., 10 Cir., 53 F.2d 453; Mutual Life Ins. Co. v. Hurni Packing Co., 8 Cir., 260 F. 641; New York Life Ins. Co. v. Levin et al., 8 Cir., 102 F.2d 403; Shaner v. West Coast Life Ins. Co., 10 Cir., 73 F.2d 681; Dudgeon v. Mutual Benefit H. & A. Assn,

4 Cir., 70 F.2d 49; Mutual Life Ins. Co. v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L.Ed. 1202.

In Shaner v. West Coast Life Ins. Co., supra, this court in an opinion by Circuit Judge Bratton treated the untruthful answering of a similar question as fraud as a matter of law.

That the insured had not forgotten about these treatments and hospitalizations at Cleveland is emphasized by his statement to Dr. Brian, his partner, in October, 1936, only five months before the application on the policy was filled out.

■ The called for facts were not disclosed by him in answer to the direct questions. Neither did he set forth the names of the several physicians who had attended and examined him, nor make mention of the swollen, tender right testicle or nodule affixed to the testicle. His failure to truthfully answer said interrogatories as to the names of the physicians and hospitals or sanitariums contributed to the contingency and event of the issuance of the policy, and the claim as to such policy being due and payable. Kansas Statutes, 40-418.

No effort was made on part of plaintiff to controvert the evidence of Dr. Engel, who made a microscopic examination of the cross-section of the nodule removed from Dr. McCurdy's neck. Dr. Engel testified that the miscroscopic examination of this cross-section disclosed that the cancer then existing had its primary origin in the right testicle. All the physicians who testified admitted that the only true test for determining whether a growth is malignant is by a miscroscopic examination of a cross-section of the tissue.

■ Certain physicians who examined Dr. McCurdy in 1936 were of the opinion at that time that it was not malignant. Dr. Engel made a microscopic examination of the cross-section of the tissue. It was determined by Dr. Engel that in his opinion, considering the history of the case, the growth or swelling of the testicle was malignant in 1936. Whether it was malignant in 1936 was not a matter for Dr. McCurdy to determine or decide in making his answers. His obligation to the company in applying for the insurance was to fully answer in writing the questions propounded to him in writing without evasion or misrepresentation or concealment. As disclosed by the uncontradicted medical evidence, members of the medical profession consider a testicular swelling resulting from an unknown cause to be a condition demanding close watching and scrutiny, realizing that in the end there might be some serious consequence. Dr. McCurdy, a physician, having had the benefit of medical training, knew that his risk would never have been accepted if he had truthfully and fully answered the questions.

When fraud is established by the uncontradicted evidence in making such an application and obtaining a policy of insurance, there can be no recovery as a matter of law, notwithstanding Revised Statutes of Kansas, Section 40-418, under the Kansas authorities hereinbefore considered.

In New York Life Ins. Co. v. Levin, 8 Cir., 102 F.2d 403, supra, was involved a Kansas insurance contract, the Kansas decisions controlling as to the law. The facts are practically and substantially the same as in the instant case. After reviewing the facts in detail, and Kansas decisions and other cases, that court denied a recovery.

Further, Dr. Ivan C. Lawler, a member of the medical board of the New York Life Insurance Company, testified that the company would have declined Dr. McCurdy's application for insurance if it had known through any source whatever that in June of 1936, Dr. McCurdy was suffering from an inflammation of the epididymis, or that a small lump had been found on his right testicle, on account of which he had within five years prior to the date of his application consulted and been examined relative thereto by physicians, or that if the company had had information that it was suspected that the applicant was suffering from carcinoma (cancer) of the testicle the application for insurance would have been declined.

As a physician, Robert Allen McCurdy, the insured, knew that this insurance company viewed with alarm any indications or symptom or probability of cancer, and the danger indicated by lump or swelling attached to or part of the testicle, a condition from which he suffered in 1935 and 1936, and caused him such concern that he sought advice and treatment from several eminent physicians. With this immediate background he remembered suffering with a cold in 1934, for ten days, which he noted in his answer in said application.

That he did not remember intervening periods of hospitalization in 1935 and 1936 in Cleveland, Ohio, and the physicians connected therewith, and the numerous tests made by them, and in answering the questions making no note of such, is incredible. That he had not forgotten these treatments and such hospitalization in Cleveland in October, 1936, is shown by the statement made by him relative thereto to his partner, Dr. Brian, only five months before the application for the insurance was made.

The judgment of the lower court is reversed and cause remanded, with directions to grant a new trial and to proceed in accordance with this opinion.

BRATTON, Circuit Judge (dissenting).

Section 40-418, General Statutes of Kansas 1935, provides that no misrepresentation made in the securing of a policy of life insurance shall be deemed material or render the policy void unless the matter misrepresented shall have actually contributed to the contingency or event on which such policy is to become due and payable. The policy in suit contains a provision that it and the application shall constitute the entire contract and that all statements made by the insured shall in the absence of fraud be deemed representations and not warranties. The law of Kansas is controlling in respect to the effect of the statute and the provision in the policy. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L. Ed. 1290; New York Life Ins. Co. v. Jackson, 304 U.S. 261, 58 S.Ct. 871, 82 L.Ed. 1329; Rosenthal v. New York Life Ins. Co., 304 U.S. 263, 58 S.Ct. 874, 82 L.Ed. 1330.

Much of the evidence is reviewed in the opinion of the majority. I do not stop to restate it or to add extensively to it. The insured was examined and tests were made. But the tests were all negative, and he was assured that he had only a nonspecific inflammatory reaction. He was advised that there was nothing to worry about, for him not to think that he had a cancerous condition, and to forget it. None of the physicians who examined him or made tests believed at the time that a malignant condition existed. They were virtually unanimous in the belief that it was merely a nonspecific inflammatory condition. And most of them testified that in their opinion his condition existing at the time of the several examinations conducted in Cleveland was merely a nonconnected coincidence with his death occurring later. The insured continued in the active practice of his profession after the examinations were conducted and the tests were made. He was about six feet in height, weighed about two hundred pounds, was healthy and robust until the spring of 1937, and lost no time from the office until about August of that year. He did not complain. He sometimes ran up the stairs to his office. He played golf, and he took golf lessons in the summer of 1937.

An incorrect or untruthful answer does not necessarily relieve an insurer of liability in Kansas. The rule under the statute there is whether the insured exercised good faith in making the answer. The question is whether he answered in good faith or with a fraudulent intent and purpose. The evidence in this case presented that question. Northwestern Mut. Life Ins. Co. v. Woods, 54 Kan. 663, 39 P. 189; Sharrer v. Capital Life Ins. Co., 102 Kan. 650, 171 P. 622; Scott v. National Reserve Life Ins. Co., 143 Kan. 678, 56 P.2d 176; Day v. National Reserve Life Ins. Co., 144 Kan. 619, 62 P.2d 925; Jackson v. National Life & Accident Ins. Co., 150 Kan. 86, 90 P.2d 1097. The court submitted the issue to the jury in clear and unmistakable instructions. The jury resolved it in favor of plaintiff. The finding is supported by substantial evidence, and the judgment should be affirmed.