**FIRST NATIONAL BANK OF MANHATTAN, KANSAS, a corporation, and Mable Claire Kellams, Plaintiffs-Appellees,**

v.

**MODERN WOODMEN OF AMERICA, Defendant-Appellant.**

No. 73–1262.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Sept. 11, 1973.

Decided Oct. 24, 1973.

---

Lee Hornbaker, Junction City, Kan., for defendant-appellant.

Richard D. Rogers, Manhattan, Kan., for plaintiffs-appellees.

Before CLARK*, Associate Justice, LEWIS, Chief Judge, and HILL, Circuit Judge.

PER CURIAM:

The appellant, Modern Woodmen of America [Woodmen] issued its insurance policy on May 28, 1968, covering the life of Rupert Allen Kellams, a merchant residing in Manhattan, Kansas. Kellams died on April 4, 1970, and Woodmen denied liability on the policy, claiming that he had made certain misrepresentations in his "Statement to Medical Examiner" filed with the company. First National Bank of Manhattan, to whom the insurance policy was pledged to secure a loan made by the Small Business Administration and the Bank, together with Claire Kellams, the widow, appellees, filed this suit to collect some $18,500 alleged to be due on the policy. The suit was initially filed in the District Court of Riley County, Kansas, but was removed on petition of Woodmen to the United States District Court on diversity of citizenship. The thrust of Woodmen's defense was that the issuance of the policy was procured by the fraudulent acts and misrepresentation of Kellams in that he had failed to list all of his hospitalizations in answer to Question 10 [1] of the "Statement" which rendered the policy void. It tendered the amount of the premiums paid. The court found on May 11, 1972 on motions for summary judgment by each of the parties that it was true that Kellams had not listed all of the times that he was hospitalized but that this was immaterial since the statement as a whole contained sufficient information to inform Woodmen of all of his illnesses and place them on inquiry. It set the case down for trial on the sole issue of whether Kellams knew that he had heart trouble and misrepresented this fact in answer to Questions 13, 14 and 19 [2] of his "Statement." After a trial before a jury the court found that there was no conflict in the evidence on this point and took the case from the jury and entered a judgment for appellees.

Woodmen raises two issues: The trial court erred (1) in overruling appellant's motion for summary judgment and limiting the issues in the subsequent trial; and (2) in holding that the application of Kellams for the insurance "as a whole contained sufficient information to inform the defendant of Kellams' previous serious illness so that

---

* Associate Justice, United States Supreme Court, Retired, sitting by designation.

1. "Statement to Medical Examiner." Record on Appeal at 133:
   Q. "10. Have you ever been in a hospital, clinic, sanatorium or institution for observation, treatment . . observation?"
   A. "Yes"
   Q. "If 'yes,' give date and details."
   A. "1964"
   Q. "Names of institutions?"
   A. "Memorial Hosp."
   Q. "Addresses of institutions?"
   A. "Manhattan, Kansas."
   Q. "Names of physicians?"
   A. "D. L. Evans, M. D."
   "Detailed History of Illness and Date"
   A. "10.
      1941—Had duodenal ulcer. One or two recurrences. At present no symptoms. Repair of inguinal hernia—2 years ago."

2. Record on Appeal at 76; "Statement to Medical Examiner," *supra*, n. 1:
   Q. "13. Are you currently receiving treatment or medication?"
   A. "No"
   Q. "14. Have you now any disease or disorder?"
   A. "No"
   Q. "19. Heart trouble, palpitation, pain in the chest, angina pectoris, shortness of breath, high or low blood pressure, disorder of blood vessels?"
   A. "No"

the failure of Kellams to list each hospitalization is immaterial as a matter of law." We have carefully reviewed the entire record and agree with the disposition made by the trial court and, therefore, affirm the judgment.

1. The rule as to summary judgment is well established; it should be entered where there is no genuine issue of material fact. Rule 56(c) Fed.R.Civ.P., Carter v. Stanton, 405 U.S. 669, 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); Gragg v. Travelers Insurance Company, 459 F.2d 418 (10th Cir. 1972). Woodmen insists that Kellams did not answer truthfully Question 10 in the "Statement" in that he failed to state that he had been hospitalized more than the one time noted in his answer, that in fact he had been hospitalized several times at Memorial Hospital in Manhattan, Kansas, (one of which he set out in his answer) as well as two other hospitals, the Riley County Hospital and the University of Kansas Medical Center at Kansas City, Kansas, in 1966. It concedes that Kellams' answer was not a warranty but only a representation and that a mere false answer would not void the policy. But it insists that when knowingly made to a material question, it will void the policy. Kansas law, which is applicable here, provides that "where proof of alleged fraud becomes conclusive by uncontradicted evidence and written admissions showing falsehood, concealment and misrepresentations . . . [the] question of [the] existence of fraud becomes [a] matter of law instead of [an] issue of fact for jury." New York Life Ins. Co. v. McCurdy, 106 F.2d 181, 187 (10th Cir. 1939). However at the time Woodmen moved for summary judgment and the order denying it was entered on May 11, 1972. Judge Templar, before whom the case was pending, specifically held that "a question of fact [remains] as to whether Kellams knew he had heart trouble and therefore whether his answer to Questions 13, 14 and 19 on the Statement to Medical Examiner are misrepresentations." He accordingly overruled Woodmen's motion for summary judgment. The same situation existed on July 7, 1972, when Judge Templar affirmed his previous ruling. Thereafter because of illness Judge Templar was unable to sit, and Judge Theis took the case for trial. After hearing evidence, before a jury, he decided that there was no proof that Kellams knew of his heart trouble and that, therefore, there was no misrepresentation. He took the case from the jury and granted summary judgment for appellees. In this order, dated September 29, 1972, Judge Theis specifically stated that he was "in agreement" with Judge Templar in the latter's action denying Woodmen's earlier motion for summary judgment filed May 11, 1972 and Templar's affirmance thereof on July 7, 1972. We believe that the denial of these motions for summary judgment by Woodmen was correct. There being an issue of fact remaining *at that time,* summary judgment was not appropriate. The fact that both of these judges came to the Federal bench after a long practice at the Kansas bar fortifies their conclusion that this procedure was in keeping with Kansas law.

2. This leads us to Woodmen's alternative issue that the trial court erred in holding as a matter of law on May 11, 1972, that the application as submitted "as a whole contained sufficient information to inform the defendant of Kellams' previous serious illness so that the failure of Kellams to list each hospitalization is immaterial as a matter of law." We agree with the trial court that Woodmen had been furnished all of the essential information that it would have had if Kellams had listed all of his hospitalizations. Indeed, the answers on their face reveal that he had been hospitalized more than once for hernia operations. Moreover, if Woodmen had inquired at Memorial Hospital of Manhattan, as set out in answer to Question 10, it would have discovered all of the information it now claims so material. This it did not do, depending instead on Woodmen's file which revealed the earlier 1967 policy issued by it to Kellams

only one year after the University of Kansas Medical Center diagnosis in 1966, the application and "Statement" on the policy under attack here, a current routine commercial checkup and the appraisal of Paul McIlvain, its Underwriter. Rather than directing that further inquiry be made, Mr. McIlvain approved the application despite his knowledge that "the chief hazard [of diabetes] in later life is the development of arteriosclerosis." Kellams was in his fifties, yet Mr. McIlvain made no further inquiry into Kellams' possible heart trouble, although he "had some idea" Kellams "might have some vascular problem." Nor did he ask for the electrocardiogram which Kellams noted on his "Statement to Medical Examiner" nor request Dr. Evans' findings nor check the record of hospitalizations which were available at the Memorial Hospital, which was noted in the answer to Question 10.

There is no claim here of conspiracy between Kellams and Dr. Evans, nor was there any concealment nor misrepresentation proven as was present in New York Life Ins. Co. v. McCurdy, *supra*. Dr. Evans was selected as the Examining Physician by Woodmen with full knowledge of the fact that he was Kellams' physician. Dr. Evans actually wrote down on the "Statement" the answers that Kellams gave to all of the questions and then had Kellams sign the statement. He, of course, knew of all of the hospitals to which Kellams had been admitted. Indeed, he himself had secured the admissions on behalf of Kellams. Evans further testified that he knew of the findings of the University of Kansas Medical Center in September, 1966, signed by Dr. Brown, that he had a copy of them in his files but put no credence in them. It is these findings that Woodmen depends upon. They recite that Kellams was in 1966 suffering from generalized arteriosclerosis; cerebral thrombosis, suspected; arteriosclerosis of coronary arteries; right bundle branch block, incomplete; diabetes mellitis; duodenal ulcer and emphysema,

obstructive. However, Dr. Robert W. Brown, the diagnostician, wrote a letter to Dr. Evans at the time he made these findings in which letter he indicated, somewhat to the contrary, that the "pain, paresthesia and transient weakness" of Kellams' right side resulted from diabetes mellitus; that the finding of "Grade II arteriosclerotic eye ground" was "consistent with the diabetes"; that he was "not certain" that the EKG showing of "short PR interval and an incomplete right bundle branch block . . . . represents any manifestation of arteriosclerotic heart disease"; that the active duodenal ulcer was consistent with Kellams' history; that the brain scan, EEG and x-rays of the skull indicated a "diffuse vascular disease" which was thought to be "the result of his diabetes which is affecting the small arteries"; that he was "unable to say whether or not a transient ischemic episode was responsible for the right sided findings", but he was inclined to think so although there was no objective evidence. Dr. Brown advised that Kellams should take Gelusil for his ulcer; that he should reduce his weight by following a "rigid diet and stop smoking." Dr. Brown also told Dr. Evans that he had not gone over his findings with Kellams, indicating that perhaps Dr. Evans might do so. However, Dr. Evans testified that he did not give Kellams a copy of the Brown findings but did go over them with him. Dr. Evans had "doubts about" Dr. Brown's diagnosis especially in view of Dr. Brown's letter accompanying it which "threw doubts on the importance of their findings as to heart disease and certainly to any cardiovascular disease." Dr. Evans also testified that as he reviewed the Brown findings with Kellams that he conveyed these doubts to Kellams and that he did not tell Kellams that he had a heart condition because he (Dr. Evans) did not "feel that he (Kellams) had a heart condition in 1969–1970."

As we look at the "Statement to Medical Examiner," its purpose was merely to develop leads for future investigation.

As the trial judge found, it is not the number of hospitals Kellams had entered but the nature and substance of the diseases that he had suffered that bore upon his insurability. Kellams enumerated to the best of his knowledge in the "Statement" every disease that he had actually suffered and that were included in the University of Kansas Medical Center diagnosis by Dr. Brown save the heart disease. And as to it Kellams answered "Yes" to Question 11 which inquired as to "any x-ray, heart study, electro-cardiogram or other laboratory examination?"; and further stated that his father had died of arteriosclerosis. In addition Dr. Evans testified that he had not advised Kellams that he had heart disease. There are other indices that support the conclusion that Kellams did not know he had heart trouble. Woodmen's salesman, Robert D. Graves, testified as to the condition of Kellams' health, etc. And see the testimony of Mrs. Kellams on this. There was no hard evidence to the contrary as to Kellams' actual knowledge of any heart condition.

In the light of these considerations, we have concluded that a literal interpretation should not be placed on the provisions of the policy. See Metropolitan Life Insurance Co. v. Brubaker, 78 Kan. 146, 150, 96 P. 62 (1908), and Farragher v. Knights and Ladies of Security, 98 Kan. 601, 159 P. 3 (1916). We must look at the four corners of the application and appended "Statement" of Kellams which in our view was made out in good faith and sufficiently informed Woodmen of his physical condition as Kellams, a layman, understood it. It is most significant that Dr. Evans, who was Woodmen's medical examiner, recommended that Kellams be insured. Appellant could have readily obtained all the relevant information from him but it failed to do so. Upon these facts we can only conclude that appellant was sufficiently put on notice as to Kellams' condition and, therefore, is chargeable with knowledge of facts which a prudent inquiry would have revealed. Major Oil Corporation v. Equitable Life Assurance Society of the United States, 457 F.2d 596 (10th Cir. 1972).

3. We have noticed with special care the action of Judge Theis in taking the case from the jury on the issue of Kellams' knowledge of his heart condition. As we have noted the only direct evidence on this question is that of Dr. Evans. He said that he did not give Kellams a copy of the University of Kansas Medical Center diagnosis but on the contrary had told Kellams specifically that he did not have heart trouble. In addition Mrs. Kellams testified that Kellams took no medication for his heart; nor did the University of Kansas Medical Center nor any other hospital or physician prescribe any heart medication; and Mrs. Kellams further testified, and the medical report confirms, that his death was sudden and without warning. Moreover, both Mrs. Kellams and Mr. Graves, the salesman who sold Kellams his policy, swore that Kellams was enjoying good health at the time. Indeed, the latter emphasized that Kellams had gone with him on vacation camping trips into the mountains at high altitudes and that Kellams neither complained nor evidenced any heart trouble. In light of the fact that Woodmen brought forth no evidence on Kellams' knowledge as to his heart condition—which burden was upon it—we conclude that Judge Theis correctly took the case from the jury, overruled Woodmen's motion for summary judgment and sustained that of the appellees.

We believe that the effort of Woodmen to avoid payment of the policy is both too little and too late. It sensed the hazards of issuing the policy and increased the premium it charged Kellams above that of the regular premium by $57.80 semi-annually, an increase of over thirty percent. Having charged this additional premium to compensate for the additional risk it found present, it cannot now renege on its contract.

Affirmed.