**MAJOR OIL CORPORATION, a Utah Corporation, Plaintiff-Appellee,**

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, a corporation, Defendant-Appellant.**

**No. 71-1208.**

United States Court of Appeals, Tenth Circuit.

March 29, 1972.

---

3. *See* Application of Reynolds, 397 F.2d 131 (3 Cir. 1968); United States ex rel. Reid v. Richmond, 295 F.2d 83 (2 Cir. 1961).

**597**

Glenn C. Hanni, Salt Lake City, Utah (Strong & Hanni, Salt Lake City, Utah, with him on the brief), for plaintiff-appellee.

Wallace D. Hurd, Salt Lake City, Utah (Nicholas A. Mescia, New York City, with him on the brief), for defendant-appellant.

Before HAMLEY,* SETH and Mc-WILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

On October 30, 1969, the Major Oil Corporation, a Utah corporation with its principal place of business in Salt Lake City, bought a $250,000 policy of insurance from the Equitable Life Assurance Society of the United States on one of its officers, Ray S. Brimhall, designating itself as the beneficiary. On November 23, 1969, Brimhall died in the Shadel Hospital in Seattle, Washington, the cause of death being "fat embolism secondary to fatty liver."

When Major made demand on Equitable for payment under the terms of the policy, Equitable refused payment on the ground that Major or Brimhall or both had misrepresented certain facts pertaining to the health of Brimhall. Thereupon Major brought the present action seeking to recover from Equitable the face amount of the policy, namely, $250,-000. In its complaint Major alleged, among other things, that all conditions of the insurance policy had been performed.

* Of the Ninth Circuit, sitting by designation.

In its answer, Equitable raised three affirmative defenses: (1) that Brimhall gave false answers to questions in the application, which were material to the risk and were relied on by Equitable in the issuance of the policy, and that had the true facts been known the policy would not have been issued; (2) that between the date of the application and the date the policy was delivered there were material changes in the statements and representations theretofore made by Brimhall in his application; and, (3) that the policy never took effect for the reason that on the day the policy was delivered and the initial premium paid Brimhall was not in good health, and therefore a condition precedent in the policy was not fulfilled.

Trial of the case was to a jury. However, after both sides rested, each moved for a directed verdict in its favor on the ground that the essential facts were not in dispute. So, though Major and Equitable were in sharp disagreement as to which party should prevail, they nonetheless did agree that the critical facts were not in dispute. The trial court denied Equitable's motion and granted that of Major, entering judgment against Equitable in favor of Major in the sum of $250,000 together with interest on such amount from and after December 30, 1969. Equitable now appeals, seeking a reversal of the judgment and a remand of the matter with direction that judgment be entered in its favor or, in the alternative, that there be a new trial.

This controversy stems from the fact that Brimhall had a drinking problem of considerable proportions and that he tried to conceal this fact from Equitable by making false statements in the application. Major concedes that Brimhall did give false answers in his application, and seeks to recover on the ground that Equitable in issuing the policy did not rely on his answers and waived the matter or, alternatively, is estopped from raising it. Under the circumstances we deem it necessary to set out the facts of the case in more than usual detail.

On August 27, 1968, Brimhall was admitted to Shadel Hospital in Seattle, Washington, where he was examined and treated by doctors and diagnosed as an alcoholic. Brimhall remained in the hospital through September 6, 1968, during which time he received aversion treatments and sodium pentothal treatments for his alcoholism. Additionally, he was given various laboratory tests, including a liver function test, the latter showing an impaired liver function. Specifically, Brimhall had an enlarged liver resulting from a fatty infiltration of the liver caused in turn by excessive consumption of alcohol over a prolonged period of time. This condition, as distinguished from cirrhosis of the liver, was one where the liver could be "rebuilt" if the intake of alcohol were eliminated or markedly reduced. Brimhall was advised by the hospital authorities that he was an alcoholic and that he had suffered impairment of his liver. As indicated, Brimhall was discharged on September 6, 1968, with the understanding that he should return for periodic "reinforcement treatments."

On October 4 and 5, 1968, and again on December 8 and 9, 1968, Brimhall returned to Shadel for such reinforcement treatments. He apparently had not been drinking during the interim. On January 26, 1969, however, Brimhall returned to the hospital in an intoxicated condition and was given further aversion treatments as well as sodium pentothal treatments. The liver function tests given on this occasion showed little improvement. On this occasion Brimhall was discharged on February 1, 1969. On February 14, 1969, Brimhall relapsed again and the president of Major, one John Fairbanks, called Shadel and was advised that Shadel would not readmit him as of that time.

However, on October 7, 1969, Brimhall was again admitted to Shadel Hospital in an intoxicated condition. On that occasion, he complained about chest pains which he said he had been experiencing for several months. Before administer-

ing further treatment, Shadel had Brimhall examined by a cardiologist who, after a series of tests, concluded that "this patient did not have angina pectoris and therefore did not have coronary heart disease, but I did not rule this out as still a possibility, but the probabilities were against it, from my examination." Accordingly, aversion treatments and sodium pentothal treatments were resumed. Liver function tests made at this time showed improvement. Brimhall was then released on October 20, 1969, and returned to Salt Lake City. On November 21, 1969, Brimhall returned to Shadel for a reinforcement treatment and apparently had had nothing to drink since his last discharge from the hospital.

On November 23, 1969, while in Shadel for the reinforcement treatment, Brimhall died in his sleep from pulmonary embolism. As indicated, Brimhall's cause of death was listed as "fat embolism secondary to fatty liver." The doctor performing the postmortem testified that there was a minimal degree of arteriosclerosis and that the liver was "sufficiently fatty to have caused his death," even though the liver itself was not "unusually large," though it was "in the top range of normal."

Brimhall submitted his application for insurance on September 9, 1969, and there is no doubt that he did give false answers to questions contained in the application. For example, he answered in the negative a question as to whether he had ever been treated for or had any known indication of any disease or disorder of the liver. Additionally, he also answered in the negative the question as to whether he had consulted or been examined or treated by any physician, practitioner or specialist in the past five years. In response to a question as to when and where he had previously been a patient in a hospital, Brimhall disclosed only that he had been in a hospital as a child to have his tonsils and adenoids removed, and in 1966 when he was hospitalized in a Salt Lake City hospital for thyroiditis. No mention was made of his hospitalization and treatment for alcoholism in Shadel Hospital.

The facts and circumstances surrounding the issuance of the policy here in question must be detailed inasmuch as the trial court in directing a verdict in effect ruled that in issuing the policy Equitable did not rely on the false answers given by Brimhall in his application and waived the matter or, alternatively, that Equitable was estopped from raising such as a defense. John Fairbanks, the president of Major, a publicly held corporation, was a former agent (from 1959 to 1962) for Equitable in Salt Lake City. In July 1969, Fairbanks was contacted by two agents of Equitable who sought to sell Major a "key man life insurance policy" on the lives of both Fairbanks and Brimhall. The agents testified that Fairbanks informed them that "he didn't know whether Brimhall could obtain insurance, standard * *," and that when asked why, Fairbanks stated that Brimhall had been an alcoholic, had been to a hospital in Seattle about a year or a year and a half before where he received the "cure" and that he had no problem at the moment. The response of the agents to this information was that "the only way to find out [whether a policy would be issued and at what rate] would be to submit applications to Equitable and to another company to determine what underwriting action might be taken." One of these agents reported the fact of Brimhall's history of alcoholism to Equitable's agency manager in Salt Lake City. The other agent on the day Brimhall was given a physical examination by Equitable's doctor alerted the doctor's office that Brimhall had a drinking problem and had been treated therefor in a Seattle hospital.

Brimhall's application was dated September 9, 1969, and in due time it was forwarded to Equitable's underwriting department in New York, N. Y. The decision to issue the policy in question was eventually made by the underwriting staff in New York City and the series of events which preceded Equitable's deci-

sion to issue the policy is of key importance.

The Medical Information Bureau, hereinafter referred to as MIB, is a central fact collecting agency to which many life insurance companies belong. Equitable, Phoenix Mutual Life Insurance Company, and Pacific Mutual Life Insurance Company (the significance of the latter two companies will be developed later), are all members of MIB. Whenever a member company receives information concerning an insurance applicant which may be helpful in judging the applicant as an underwriting risk, the member company reports such to MIB, who in turn relays the information to all member companies in code form. In 1968, Pacific Mutual had thus given MIB certain information concerning Brimhall which MIB had in turn passed on to its members, including Equitable, in code form. Accordingly, when Brimhall's application was received in Equitable's underwriting department in New York, the aforesaid MIB code information was placed on the application before it was assigned to its staff underwriter.

The code form on Brimhall was: "M 68/4/30 010 MN." The first letter "M" indicates that the report came from the state of Utah. The numbers "68/4/30" indicate that the date of the report was April 30, 1968. The numbers "010" mean that Brimhall had done some drinking or had a habit problem due to drinking. The second letter "M" indicates the drinking occurred more than once, and the letter "N" indicates this occurred within a period of a year prior to the date of the report.

Equitable's staff underwriter testified that he noticed the MIB code report on Brimhall's application and that such alerted him and served as a "flag." Under the rules of the MIB when a member company, such as Equitable, is alerted by seeing an MIB code report on one who has made application for insurance, the procedure is for the company to first conduct its own independent investigation through its own inspection department. Equitable incidentally has twelve

regional offices all over the United States which have salaried employees whose job is to investigate insurance applicants. Under MIB procedures, if the investigation by the member company *confirms* the MIB code there is of course no need to obtain from MIB the more detailed information supporting the code report. However, if the investigation conducted by the member company does *not* confirm the MIB code, then the member company may request and obtain the details by stating on their request "Our investigation does not confirm." When such request is made, MIB contacts the member that made the initial report and obtains all information the reporting company has and then transmits it to the requesting company.

In the instant case, the independent investigation conducted by Equitable did *not* confirm the MIB code report, i. e., Equitable's investigation did *not* reveal a drinking problem on the part of Brimhall, so in line with the established procedure Equitable's staff underwriter noted on the underwriting file "Request MIB details." For some unexplained reason this request never left Equitable's office to the end that Equitable never did receive the additional MIB information regarding Brimhall. Rather, Equitable's staff underwriter had an additional investigation made by one of Equitable's investigative agents, and the underwriter also obtained a retail credit report on Brimhall. It was in this setting that Equitable decided to issue the policy.

As earlier indicated, it was determined by Equitable that in view of Brimhall's history of alcoholism his application would be submitted to two insurance companies. Accordingly, Equitable's agent submitted the application not only to Equitable, but also to Phoenix Mutual Life Insurance Company. Phoenix Mutual, like Equitable, is a member of MIB, and the same MIB code information as was in the possession of Equitable was also in the possession of Phoenix Mutual. Like Equitable, Phoenix Mutual's investigation did *not* confirm the MIB

code report, so Phoenix Mutual requested the details from MIB. Unlike Equitable, however, Phoenix Mutual received the MIB detailed information and learned that the reporting company was Pacific Mutual. Coincidentally, Pacific Mutual's report was founded, in part, on a medical report prepared by a Salt Lake City doctor who was himself one of Equitable's examining physicians. Without going into further detail on this phase of the case, Phoenix Mutual after further investigation apparently determined that it would not issue a policy. In any event, on October 29, 1969, an underwriter for Phoenix Mutual telephoned the underwriting department of Equitable and informed the latter that Phoenix Mutual had received the MIB details and that based on such information and their own further investigation of the matter they had a "lot of concern about this from an underwriting standpoint." The gist of the information given Equitable on this occasion was that Phoenix Mutual had developed information to the effect that Brimhall had an alcoholic problem of a continuing nature and that Equitable ought to take a "hard look at it." In the course of this conversation the Phoenix Mutual representative learned that Equitable had not even obtained the MIB details, all of which prompted the Phoenix Mutual representative to make the following notation in his file: "Really incredible that the other company would overlook the code, but we can't."

Although Equitable had time to hold up delivery of the policy even after the call from Phoenix Mutual, it did not do so, and on October 30, 1969, the policy was delivered to Major and Equitable accepted from Major the initial premium of $12,523.

To round out the factual picture, after Brimhall's death Equitable did avail itself of MIB's information and then contacted Pacific Mutual, learning from the latter that Brimhall had been hospitalized in Shadel Hospital in Seattle and had in fact made claim for the expense of his initial hospitalization in Shadel

Hospital in August and September 1968, which claim Pacific Mutual paid. Additionally, Pacific Mutual had information in its file to the effect that "he [Brimhall] was an alcoholic and would come to work, park his trailer at the company site and many times would proceed to go to the trailer and drink until he would pass out." Equitable's staff underwriter who authorized the issuance of the policy admitted on cross-examination that if that company had gone to Pacific Mutual *before* the policy was issued, it would have received the same information as they acquired in the investigation made *after* Brimhall's death.

The foregoing indicates the general state of the record on which the trial court directed a verdict in favor of Major and against Equitable for the face amount of the policy plus interest. It is Major's basic position in this court that as a matter of law Equitable in issuing the policy did not rely on any misrepresentations made by Brimhall in his application and accordingly waived any such misrepresentations, or, alternatively, that Equitable is estopped from asserting such misrepresentations as a defense to an action brought to recover on the policy. In support of this contention, Major relies on a combination of undisputed facts, namely, (1) at the very outset Fairbanks informed Equitable that Brimhall had a history of excessive drinking and had been treated for alcoholism in a Seattle hospital; (2) the MIB code alerted Equitable to Brimhall's drinking problem, with Equitable thereafter failing to avail itself of the MIB information which if pursued by Equitable would have revealed his hospitalization and treatment in Shadel Hospital; and, (3) Phoenix Mutual advised Equitable as to what its investigation of Brimhall had revealed concerning the latter's continuing drinking habits and warned Equitable of its concern. On this state of the record, argues Major, the trial court was fully justified in directing a verdict against Equitable. We agree.

A case which sets forth quite well the general principles which control the instant controversy is New York Life Insurance Company v. Strudel, 243 F.2d 90 (5th Cir. 1957). In that case involving an action brought to collect on a policy of insurance the insurance company defended on the ground that the insured gave false answers in the application concerning an existing heart condition. The jury returned a verdict for the beneficiary and on appeal the judgment was reversed on the ground that the evidence as to notice and knowledge on the insured's answers on the application was insufficient to warrant a submission of the case to the jury. In passing, we would observe that the evidence in *Strudel* concerning notice and knowledge on the part of the insurance company was far less than that in the instant case. There, the insurance company made inquiry to MIB and its request was refused by the reporting company on the ground that the information was confidential. Such is markedly different from the instant case where Equitable's request never got out of its office, and MIB clearly would have furnished information on receipt of a request therefor. In any event, reference is made to *Strudel* primarily because of the definitive statement of the general principles which govern. In that case appears the following:

" * * * The general rule is, of course, that the intentional misrepresentation by the applicant of a material fact relied on by the insurer permits the latter to void the policy. * * * To this rule there are at least two somewhat intertwined and frequently confused, but nevertheless distinct, corollaries, which enable an insured to escape its rigors if it can be shown that there was no, or there should not have been any, actual reliance, and thus in effect there was no deception: (1) if the insurer has actual knowledge of the true facts, or of the falsity of the statements, or at least has sufficient indications that would have put a prudent man on no-

tice and would have caused him to start an inquiry which, if carried out with reasonable thoroughness, would reveal the truth, he cannot blind himself to the true facts and choose to 'rely' on the misrepresentation; (2) if the insurer chooses to make an independent inquiry and the subject matter and the circumstances are such that he is in a position to ascertain the facts by a reasonable search, then he cannot plead reliance even if his investigation is as a matter of fact cursory and did not reveal the true facts—and if in the course of such an investigation he finds clues indicating the falsehood of some representations he is also bound, by the first rule, by what a reasonable inquiry into those clues would show. Thus in the first case the question is whether the truth was sufficiently apparent, in view of all the facts known by or coming to the attention of the insurer, that a reasonable inquiry induced thereby would have revealed the falsehood of the representation; in the second the question is whether the insurer was in a position to make the type of inquiry that would reveal the truth and actually chose to do so. * * * "

Columbian Nat. Life Ins. Co. v. Rodgers, 116 F.2d 705 (10th Cir. 1940), cert. denied, 313 U.S. 561, 61 S.Ct. 838, 85 L.Ed. 1521 (1941), also sheds considerable light on the present controversy. There, in an action on a policy of life insurance, the insurer defended on the ground that the insured made false and fraudulent representations of fact, which were material to the risk, in answers to questions in the application for the policy. The untrue answers pertained to the insured's answer that he had not been declined insurance on any other application for insurance, when in fact a prior application to the John Hancock Company had been declined. In that case, the insurer had in its files MIB information which imparted the fact that the applicant had applied to some other company, which company had "created a record against him," though the MIB

code did not indicate that the application had been "declined." Thereafter, the insurer did not avail itself of the more detailed information available in the MIB files and proceeded to issue the policy. In upholding the judgment of the trial court in favor of the beneficiary, we observed as follows:

"Courts are loathe to enforce forfeitures, and indeed they should be, except where an insurer has so conducted itself in the issuance of the policy as to preclude it from asserting any ground upon which it might be entitled to avoid the policy. There is no doubt but that an insurer may waive provisions inserted in the contract for its benefit, and may be estopped from asserting reasons ordinarily justifying a forfeiture of the policy. Knowledge of facts inconsistent with statements in an application may constitute an equitable estoppel against an insurer precluding it from asserting a ground for avoidance of the contract, and it is not essential that the knowledge be derived from the insured. An insurance company may be charged with knowledge of facts which it ought to have known * * *. Knowledge which is sufficient to lead a prudent person to inquire about the matter, when it could have been ascertained conveniently, constitutes notice of whatever the inquiry would have disclosed, and will be regarded as knowledge of the facts. * * * "

In *Rodgers*, we were applying Kansas substantive law, and Utah's law on this particular subject would appear to be the same as that of Kansas. In Wootton v. Combined Insurance Company of America, 16 Utah 2d 52, 395 P.2d 724 (1964), a summary judgment was entered in favor of the beneficiary named in a policy of life insurance where the insurer defended on the grounds of false answers in the negotiations for the policy. In upholding the action of the trial court, the Utah Supreme Court declared as follows:

"The failure of respondent [the beneficiary] to volunteer the information that her husband had resigned his job in July because with the added work his weak leg was being adversely affected cannot reasonably be considered as sufficient evidence upon which to base a finding of intent to defraud. Appellant had sufficient knowledge of the physical disability of respondent's husband to ascertain all the facts it needed as to its extent, if it had deemed it important, by either asking further questions or conducting an investigation; and it cannot blind itself from ascertaining the truth and then claim wilful misrepresentation of the truth on which it relied in order to avoid payment under a policy. * * "

The foregoing general principles of law are not really in dispute. Counsel do differ though in their application of such to the facts of the case. For example, as concerns the information given Equitable by Fairbanks, Equitable first contends that under the circumstances such could not be imputed as a matter of law to the company, and secondly that in any event the information thus acquired was insufficient to put the company on notice. Equitable concedes that the general rule is that knowledge obtained by an agent of the insurer while acting within the scope of his authority is imputed to the insurer, whether such is actually communicated or not. Lumbermens Mutual Insurance Company v. Bowman, 313 F.2d 381 (10th Cir. 1963). However, Equitable seeks to bring itself within the exception to the rule which provides that the knowledge of the agent is not to be imputed to the company where the circumstances plainly indicate that the agent will not advise his principal of the information acquired by him. Mutual Life Insurance Company of New York v. Bohlman, 328 F.2d 289 (10th Cir. 1964). In our view, however, the record does not support the suggestion that Fairbanks somehow knew that the agents would not inform the company of that which he had specifically brought to their attention concerning Brimhall's drinking problem. And of course the fact of the matter is that one of the

agents did advise his supervisor of what he had learned from Fairbanks, and the other agent advised the office of the examining doctor. We find no error in the trial court's holding that the information given the agents by Fairbanks was imputed to the company.

There is some minor dispute as to just how much information Fairbanks gave the agents as concerns the extent of Brimhall's drinking problem. Fairbanks testified that he told them Brimhall was an alcoholic, that Brimhall had been to Shadel Hospital for treatment and had gone back several times for refreshers, and that though he had "fallen off" a couple of times he was satisfied he had overcome the problem. The agents didn't recall such detail, but did agree that they were informed that Brimhall at least at one time had a drinking problem of sufficient proportions to require hospitalization in Seattle, Washington, something over a year before. Be that as it may, whatever information was given the agents was under the circumstances imputed to Equitable, and at the very least the company was put on notice at the outset that Brimhall had a history of alcoholism. We need not decide whether the information given the agents by Fairbanks was in and of itself sufficient to put Equitable on notice, for the reason that there is considerable other evidence bearing on this point. And our task is to determine whether in the light of the *entire* record the action of the trial court was justified.

■ As concerns the MIB code information, Equitable contends that such is insufficient to impute to the company knowledge of Brimhall's several confinements and treatment at Shadel Hospital in Seattle. It is true that the MIB code did not reveal the fact that Brimhall had been treated for alcoholism in Shadel Hospital. However, as above indicated, the test is not whether Equitable had actual knowledge of all the true facts, nor of the falsity of Brimhall's statements, but whether it had sufficient information that would have put a prudent man on notice and would have caused him to

start an inquiry which, if carried out with reasonable thoroughness, would have revealed the truth. New York Life Insurance Co. v. Strudel, *supra.* Our study of the record convinces us that as a matter of law Equitable did have sufficient information to put it on notice to the end that as a "prudent man" it would have, for example, acquired the MIB information. And from what was actually done *after* Brimhall's death by way of building a defense against the claim of Major, we know that a reasonable investigation *before* the issuance of the policy by Equitable based on the MIB information would have led straight to Shadel Hospital where it would have learned of Brimhall's several confinements, treatments given, and indeed a complete report on his general physical condition. But again, we need not determine whether the MIB code was in and of itself sufficient to put Equitable on notice. Our problem is whether the cumulative effect of *all* the evidence bearing on this issue was sufficient to put Equitable on notice.

Equitable in its brief makes no mention of the warning telephone call from Phoenix Mutual the day before the policy was hand delivered by Equitable agents to Major. However, the plain import of the information thus given Equitable by Phoenix Mutual was that the latter's investigation indicated that Brimhall had a serious drinking problem of a continuing nature.

■ Without further belaboring the point, our study of the record convinces us that the trial court did not err in directing a verdict for Major. It would be difficult to imagine a case where an insurance company could have more notice than did Equitable that the insured had given false answers in his application. In sum, we conclude as a matter of law that from a totality of the facts and circumstances, Equitable had sufficient information that Brimhall had a drinking problem which would have put a prudent man on notice and would have caused him to start an inquiry which, if carried out with reasonable thorough-

ness, would have revealed the truth. This is not an instance where the defending insurance company should have been more suspicious of the decedent's application and should not have allowed itself to become the victim of the decedent's false and fraudulent answers. Rather, this is a case where the defending insurance company had a variety of information which when blended together was amply sufficient to put it on notice as to the falsity of Brimhall's answers. In such event it cannot blind itself from ascertaining the truth and later claim willful misrepresentation of the truth on which it relied in order to avoid payment under the policy.

 Equitable also claims that there was such a change in Brimhall's physical condition between the date of the application and the date the policy was delivered as to preclude Major from recovery on the policy, and as a corollary of this argument it is said that Brimhall was not in "good health" on the date the policy was delivered and therefore the policy never took effect. Such is based primarily on the fact that Brimhall returned to Shadel Hospital after the date of his application for further treatment for his alcoholism at which time he also made complaint about chest pains. However, had Equitable pursued the MIB information to its logical conclusion it presumably would have availed itself of *all* of the information at Shadel Hospital, which would have included, for example, the cardiology tests. And in any event, the cardiology tests were essentially negative in nature. Under all the circumstances we find no merit in this particular argument.

Error is also assigned to the exclusion by the trial court of certain testimony offered by Equitable. We find no such error and in view of the trial court's ultimate disposition of the case any possible error in this regard would not be prejudicial.

Throughout, Equitable attempts to draw a distinction between a *past* drinking problem and a *present* drinking problem and claims that evidence of the former is no evidence of the latter. In this regard, it is further submitted that evidence of a *past* drinking problem is not even sufficient to put it on notice as to a possible *present* drinking problem. This distinction is too finely drawn and ignores the harsh realities of life.

Judgment affirmed.