**UTAH POWER & LIGHT COMPANY,**
Plaintiff–Appellee,

v.

**FEDERAL INSURANCE COMPANY,**
Defendant,

International Insurance Company; Twin City Fire Insurance Company; First State Insurance Company, Defendants–Third–Party–Plaintiffs–Appellants,

St. Paul Surplus Lines Insurance Company; Allianz Underwriters Insurance Company, fka Allianz Underwriters, Incorporated; California Union Insurance Company, Defendants–Appellees,

Alexander & Alexander; Emery Mining Corporation, Third–Party–Defendants–Appellees.

Nos. 91–4120, 91–4121.

United States Court of Appeals,
Tenth Circuit.

Jan. 26, 1993.

---

P. Keith Nelson (Michael P. Zaccheo and Christian W. Nelson, of Richards, Brandt, Miller & Nelson, with him on the briefs), of Richards, Brandt, Miller & Nelson, Salt Lake City, UT, for defendant-third-party-plaintiff-appellant Intern. Ins. Co.

Shawn McGarry (Carman E. Kipp and William W. Barrett, of Kipp & Christian, P.C., with her on the briefs), of Kipp & Christian, P.C., Salt Lake City, UT, for defendants-third-party-plaintiffs-appellants Twin City Fire Ins. Co. and First State Ins. Co.

Terry M. Plant (John N. Braithwaite, of Hanson, Epperson & Smith, with him on the brief), of Hanson, Epperson & Smith, Salt Lake City, UT, for third-party-defendant-appellee Alexander & Alexander.

Stephen B. Nebeker (Paul D. Newman, of Ray, Quinney & Nebeker, and Raymond J. Etcheverry and Kent O. Roche, of Parsons, Behle & Latimer, with him on the brief), of Ray, Quinney & Nebeker, Salt Lake City, UT, for plaintiff-appellee Utah Power & Light Co. and third-party-defendant-appellee Emery Mining Corp.

George E. Sayre (Edward M. Laine, of Oppenheimer, Wolff & Donnelly, St. Paul, MN; and B. Lloyd Poelman, Daniel Bay Gibbons, and Von G. Keetch, of Kirton, McConkie & Poelman, Salt Lake City, UT, with him on the brief), Sedgwick, Detert, Moran & Arnold, San Francisco, CA, for defendants-appellees St. Paul Surplus Lines Ins. Co., Allianz Underwriters Ins. Co. and California Union Ins. Co.

Before SEYMOUR, MOORE, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

In this action for declaratory relief, appellants seek review of a series of district court orders granting appellees' motions for partial summary judgment over a two-year period. In accordance with these rulings and others, the district court entered a Final Judgment and Stay of Proceedings pursuant to Fed.R.Civ.P. 54(b), and this appeal followed. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

In December 1984, a fire in the Wilberg Mine in central Utah killed twenty-seven miners. Utah Power & Light Company ("UP & L") owned the mine which the

Emery Mining Corporation ("Emery") operated pursuant to a Coal Mining Agreement. The agreement required Emery, who employed the miners, to insure and indemnify UP & L from claims arising out of Emery's operation of the mine. The miners' estates brought wrongful death actions against UP & L that were consolidated under the caption *Janice Faye Carter, et al. v. Utah Power & Light Company*, Civ. No. 68596 (4th Dist.Ct., Ut.Co., Utah). In March 1987, UP & L settled all of the *Carter* claims for approximately $22 million.

At the time of the fire, UP & L had liability insurance with St. Paul Surplus Lines Insurance Co. ("St. Paul"), Allianz Underwriters Insurance Co. ("Allianz"), and California Union Insurance Co. ("Cal Union") (collectively the "UP & L Insurers"). At the same time, Emery had liability insurance with Federal Insurance Co. ("Federal"), International Insurance Co. ("International"), Twin City Fire Insurance Co. ("Twin City"), and First State Insurance Co. ("First State") (collectively the "Emery Insurers"). Of the Emery Insurers, Federal provided primary coverage and International provided the first layer of excess coverage.

In February 1985, UP & L tendered the defense of the *Carter* action to both the Emery and UP & L Insurers. Federal agreed to defend UP & L under a reservation of rights and approved UP & L's retention of counsel. Throughout 1985 and half of 1986, UP & L provided litigation status reports to both the Emery and UP & L Insurers. During 1986, UP & L began urging the Emery Insurers to settle the *Carter* claims, but the Emery Insurers insisted that the UP & L Insurers be involved in the settlement negotiations. In June 1986, UP & L requested settlement authority for the first time, but both lines of insurers were ultimately unwilling to provide significant authority. In December 1986, Federal tendered its $500,000 policy limit, and advised UP & L that it would no longer make interim payments for the defense costs.

In January 1987, UP & L decided to settle the *Carter* claims with its own funds and filed this declaratory judgment action against both the Emery and UP & L Insurers claiming bad faith and seeking coverage and indemnification for any judgment entered against UP & L in the *Carter* action. UP & L continued settlement negotiations, and on March 6, 1987 it notified both lines of insurers that it intended to settle the *Carter* claims for approximately $22 million and sought the insurers' consent by March 11, 1987. UP & L received no response by that date and proceeded to settle the claims. On March 19, 1987, UP & L notified both lines of insurers of the settlement and sought funding for it. International tendered its policy limit of $10 million, subject to certain conditions, in exchange for a dismissal of the bad faith portion of the declaratory judgment action.

In response to UP & L's declaratory judgment action, International raised affirmative defenses based on fraud, misrepresentation, and omission and filed a counterclaim against UP & L, and a third-party complaint against Emery, for rescission of its insurance contract. International also filed a counterclaim against UP & L alleging that the amount of the *Carter* settlement was unreasonable and a third-party complaint against insurance broker Alexander & Alexander ("A & A") for negligently providing services. In addition, both the Emery and UP & L Insurers filed cross-claims against each other arguing that if any insurers were liable for coverage, it was the other line of insurers.

During the next three years the district court entered numerous orders granting partial summary judgment. The following five rulings are contested on appeal. On April 21, 1989, the court ruled that International is barred from contesting the reasonableness of the *Carter* settlement. *See Utah Power & Light Co. v. Federal Ins. Co.*, 711 F.Supp. 1544 (D.Utah 1989). On May 8, 1990, the court rejected the Emery Insurers' "other insurance" defenses and ruled that the Emery Insurers were primarily liable for the amount of the *Carter* settlement. In an August 13, 1990 order, the court ruled that UP & L is an insured under the International policy issued to Emery as the named insured. By an Au-

gust 10, 1990 ruling and an April 26, 1991 memorandum decision, the court rejected International's defenses and claims based on fraud, misrepresentation, and omission. On April 26, 1991, the court entered a memorandum decision dismissing with prejudice all of International's claims against A & A. In accordance with these rulings, the court entered a Final Judgment and Stay of Proceedings on June 19, 1991 which included a declaratory judgment that UP & L is an insured under the International policy and that International is obligated to pay its $10 million policy limit to UP & L.

International raises five issues on appeal, arguing that the district court erred in granting summary judgment in finding that: (1) UP & L is an insured under International's policy; (2) International waived and is estopped from raising defenses and claims based on misrepresentation and omission; (3) International is barred from contesting the reasonableness of UP & L's settlement of the *Carter* cases; (4) International is primarily liable relative to the UP & L Insurers; and (5) there is no support for International's negligence claims against A & A. Twin City and First State join International in arguing that they are not primarily liable relative to the UP & L Insurers.

## DISCUSSION

■ On appeal, we review the grant of summary judgment de novo, using the same standards applied by the district court. *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

■ The substantive law regarding a claim will identify which facts are material in a motion for summary judgment, and only factual disputes that might affect the outcome of the case under governing law will preclude entry of summary judgment. *Id.* at 248, 106 S.Ct. at 2510. In applying this standard, we view the evidence, and all reasonable inferences derived from the evidence, in the light most favorable to the party opposing the motion. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990).

■ In this diversity case governed by Utah law, we must ascertain and apply Utah law such that we reach the same result that the Utah courts would reach. *Adams–Arapahoe Sch. Dist. No. 28–J v. GAF Corp.*, 959 F.2d 868, 870 (10th Cir. 1992). We review de novo the district court's rulings with respect to Utah law. *See Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). Under Utah law, insurance policies are construed using general contract principles. *Bergera v. Ideal Nat'l Life Ins. Co.*, 524 P.2d 599, 600 (Utah 1974). The interpretation of an unambiguous contract is a question of law to be determined by the court and may be decided on summary judgment. *Morris v. Mountain States Tel. & Tel. Co.*, 658 P.2d 1199, 1201 (Utah 1983). If the policy language is clear and unambiguous, the court must construe it according to its plain and ordinary meaning. *See Draughon v. CUNA Mut. Ins. Soc'y*, 771 P.2d 1105, 1108 (Utah Ct.App.1989).

### I.

■ International argues that UP & L is not an insured under the policy it issued to Emery as the named insured. Part III, section 1 of the policy defines the word "insured" to include Emery, as the named insured, and

(d) any person, organization, trustee or estate to whom or to which the Named Insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or on behalf of the Named Insured, or to facilities of or used by the Named Insured.

The plain meaning of subsection (d) indicates two requirements that must be met

for UP & L to be an insured under the International policy. First, Emery must be obligated by written contract to provide UP & L with the type of insurance provided by the International policy. Second, the Wilberg Mine fire must have involved either operations by or on behalf of Emery, or facilities of or used by Emery.

It is uncontroverted that the Coal Mining Agreement between UP & L and Emery required Emery to obtain liability insurance and to name UP & L as an insured. Section 16.04 of the agreement provides in part:

> [Emery] shall obtain and maintain insurance with such coverages and of such types, limits and amounts and with such insurance carriers as may be from time to time approved by [UP & L].... All such insurance shall include the interest of [UP & L] or any equipment used in the production of coal at such mines, shall name [UP & L] as an insured party and shall provide that losses, if any, shall be payable to [UP & L].

The Coal Mining Agreement, requiring Emery to obtain the liability policy provided by International, thus satisfies the first requirement for an insured under International policy section (d).

The uncontested facts also satisfy the second requirement under section (d) which limits coverage to "operations by or on behalf of [Emery], or to facilities of or used by [Emery]." It is uncontroverted that the fire which gave rise to the *Carter* action occurred at the Wilberg Mine, a facility used by Emery in the course of its mining operation. Because both requirements under section (d) are satisfied, we find that the district court did not err in ruling that UP & L is an insured under the International policy.

## II.

International argues that the district court erred in holding as a matter of law that it waived and is estopped from raising general defenses and claims based on mis-

representation and omission. International sought to rescind the policy, asserting that Emery and UP & L made material misrepresentations and omissions during the application process. It contended that, had it received full and accurate information before issuing the policy, it would have materially altered the coverage and premiums or denied coverage altogether.

■ International provided Emery's first layer of excess insurance for two years prior to issuing the contested 1984–85 policy. It alleges that the application for the 1984–85 policy contained the following omissions and misrepresentations: (1) Emery failed to disclose a complete claims history and the existence of the Coal Mining Agreement—including the provision by which Emery agreed to indemnify UP & L; (2) Emery failed to disclose UP & L's control over the mining operations and the exposure International incurred by naming UP & L as an additional insured; (3) Emery failed to disclose its safe harbor leasing program; and (4) Emery misrepresented that any claims against UP & L should be successfully defended because workers' compensation is the sole remedy under Utah law.

■ It is well established that an insurer may avoid liability under a policy if it relies on an applicant's material omissions or misrepresentations. *See* Utah Code Ann. § 31–19–8(1) (1974);[1] *Perkins v. Great–West Life Assurance Co.*, 814 P.2d 1125, 1130 (Utah Ct.App.1991). It is also well settled, however, that "[a]n insurance company cannot escape liability on a policy if it is established that there should have been no actual reliance on the applicant's misrepresentation, concealment, or omission." *Hardy v. Prudential Ins. Co. of Am.*, 763 P.2d 761, 770 (Utah 1988).

One corollary to this estoppel rule is that "if the insurer has actual knowledge of the true facts, or of the falsity of the statements, ... he cannot blind himself to the true facts and choose to 'rely' on the mis-

---

**1.** International relies on this section which was in effect at the time Emery applied for coverage. Section 31–19–8(1) was replaced entirely by

Utah Code Ann. § 31A–21–105 effective July 1, 1986.

representations." *Major Oil Corp. v. Equitable Life Assurance Soc'y of United States*, 457 F.2d 596, 602 (10th Cir.1972) (applying Utah law). With respect to International's first allegation, we find that International could not reasonably rely on the omissions as a matter of law because it had "actual knowledge of the true facts, or of the falsity of the statements" before issuing the 1984–85 policy. *Id.* It is uncontroverted that by May 13, 1983, insurance broker A & A had given International's managing general agent and underwriter, The London Agency, Inc. ("London"), written notice of two Emery employees' claims for job-related injuries that were brought against UP & L as owner of the mine for its own negligence. Emery sent the notices to International as the first level excess insurer because the claims presented potential liability exceeding the primary policy's limits. Included with the notices were copies of the complaints naming UP & L and letters from UP & L to Emery demanding that Emery defend and indemnify UP & L pursuant to the Operating Agreement, which was the precursor to their Coal Mining Agreement. The demand letters referred to, and quoted directly from, the indemnification provision in the Operating Agreement. In light of these uncontested facts, we find that International had actual knowledge of Emery's claims history, the Operating Agreement, and the indemnification provision and is therefore estopped from rescinding the policy because its reliance on the alleged omissions was not reasonable as a matter of law.

As to the second allegation regarding UP & L's control over mine operations, International complains that, where the application requested a complete description of the applicant's operations, Emery wrote "Coal Mining Contractor for Utah Power & Light Co., tonnage 5,000,000 annual," and did not indicate that UP & L would be actively involved in the mining operation. We find that International's complaint is unfounded because the application directive could not be perceived to require information about the level of UP & L's involvement in the operation, and Emery did not otherwise

have a duty to volunteer the information. *See Home Sav. & Loan v. Aetna Casualty & Sur. Co.*, 817 P.2d 341, 359 (Utah Ct. App.1991). Absent a showing of concealment—which International does not allege—it is the insurer's duty to ask questions and ascertain the facts it deems material to deciding whether to approve a policy application. *Id.* at 359–60. Because International knew that UP & L owned the mine but failed to inquire further about UP & L's involvement in the mining operation, we conclude that it blinded itself to the true facts and cannot reasonably rely on the alleged omission.

In the third allegation, International contends that Emery omitted material facts about its business activities other than coal mining. In particular, Emery failed to disclose five equipment financing leases ("safe harbor leases") that it entered into in order to reduce its income tax liability. The arrangement allowed Emery to obtain financing on its credit which it used to purchase equipment selected by KNT Leasing Corporation ("KNT"). Emery then leased the equipment back to KNT which possessed, operated, and maintained the equipment.

The test for whether a fact is material to the risks assumed under an insurance policy is whether "reasonable insurers would regard the fact as one which substantially increases the chance that the risk insured against will happen and therefore would reject the application." *Hardy*, 763 P.2d at 769–70. Although International proffered deposition testimony that the existence of the safe harbor leases is material to risk assessment, we find as a matter of law that no reasonable insurer would regard it as material under the *Hardy* test. The safe harbor leases were financing leases, rather than commercial leases, and did not subject Emery to tort liability. *See Nath v. National Equip. Leasing Corp.*, 497 Pa. 126, 439 A.2d 633, 636 (1981). Moreover, even if Emery were exposed to tort liability, each lease contained provisions requiring KNT to indemnify Emery against any liability arising out of operation of the equipment and to provide liabili-

ty insurance to cover the operation of the equipment. It is uncontroverted that KNT provided the required insurance.

■ Finally, International contends that, in response to an application directive about its claims history, Emery made a material misrepresentation by stating that "suit later brought for Liability against Utah Power & Light should be successfully defended as Workers Comp. is sole remedy under Utah law." The Utah courts have not addressed the question of whether an insurer may seek rescission based on misrepresentations of law or statements of opinion rather than misrepresentations of fact. All of the Utah rescission cases based on an insured's misrepresentations involved misrepresentations of fact. *See e.g., Golden Rule Ins. Co. v. Hughes,* 784 F.Supp. 817, 819 (D.Utah 1992); *Wisconsin Mortgage Assur. Corp. v. HMC Mortgage Corp.,* 712 F.Supp. 878, 879 (D.Utah 1989); *Perkins,* 814 P.2d at 1130; *Hardy,* 763 P.2d at 765–67. After reviewing the relevant law, however, we conclude that there is no legal basis for such a claim.

A distinction between misrepresentations of fact and misrepresentations of law or opinions has been recognized in a number of related contexts. For example, an insurer may not disaffirm a settlement that was reached on the basis of an insured's opinion or misrepresentations of law. *See* 6 Appleman, *Insurance Law and Practice* § 3978, at 671 (revised ed. 1972). In addition, an insurer's misrepresentations of law are not actionable unless there is a confidential relationship between the parties or the insurer has greatly superior knowledge of the subject matter. *See* 16B Appleman § 9088, at 571 (revised ed. 1981); 28 Am.Jur.2d *Estoppel and Waiver* § 47, at 655–56 (1966). And in Utah, misrepresentations of law and opinions about the legal effect of contracts are not adequate bases for actionable fraud. *See Gadd v. Olson,* 685 P.2d 1041, 1044 (Utah 1984); *Berkeley Bank for Coops. v. Meibos,* 607 P.2d 798, 805 (Utah 1980).

There are two rationales for these distinctions: (1) it is unreasonable to rely blindly on another's opinion, and (2) no one can be deceived by a misrepresentation of law because everyone has access to the law and may be presumed to know it. *See Fields v. Life & Casualty Ins. Co.,* 349 F.Supp. 612, 615 (E.D.Ky.1972). We find these rationales applicable in this context as well and have found general support for applying them to the instant case:

> [A]lthough false, a representation of the expectation, intention, belief, opinion, or judgment of the insured will not avoid the policy if there is no actual fraud in inducing the acceptance of the risk, ... and this is likewise the rule although the statement is material to the risk, if the statement is obviously of the foregoing character, since in such case the insurer is not justified in relying upon such a statement, but is obligated to make further inquiry.

43 Am.Jur.2d *Insurance* § 1016 (1982). International could have discovered the falsity of Emery's representation through legal inquiry and, having failed to do so, it is estopped from rescinding the policy on the basis of that misrepresentation.

Without reaching the question of waiver, we affirm the district court and conclude that International is estopped from rescinding its policy.

### III.

International argues that the district court erred in ruling as a matter of law that International waived its right to challenge the reasonableness of the settlement amount in the *Carter* cases and was therefore estopped from raising the reasonableness defense. The district court held that, where the primary insurer abandoned its duty to defend the insured, "the excess carriers had an implied duty to defend that placed them in the position of being required to object to the settlement agreement *after they received notice of it and before it was entered." Utah Power & Light,* 711 F.Supp. at 1556. In concluding that International was bound by the *Carter* settlement, the district court relied on *Losser v. Atlanta International Insurance Co.,* 615 F.Supp. 58 (D.Utah 1985), which held that an insurer who refuses to defend

a claim against its policy and participate in the settlement process is bound by the settlement agreement absent a showing of collusion or bad faith. *Id.* at 61.

■ We do not agree that International had a duty to defend UP & L. We base this conclusion on the plain meaning of International's policy which contains the following provisions:

[CONDITION] E. **Assistance and Cooperation.** Except as provided in Insuring Agreement II (Defense Settlement) or in Condition J (Underlying Insurance) the company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured, but the company shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve the company. In such event the insured and the company shall cooperate fully.

\*  \*  \*  \*  \*  \*

II. **DEFENSE SETTLEMENT**

With respect to any occurrence covered by the terms and conditions of this policy, but not covered, as warranted, by the underlying policies listed in Schedule A hereof or not covered by any other underlying insurance collectible by the insured, the company shall:

(a) defend any suit against the insured....

\*  \*  \*  \*  \*  \*

[CONDITION] J. **Underlying Insurance.** If underlying insurance is exhausted by any occurrence the company shall be obliged to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

Construing this policy language, as we must, according to its plain and ordinary meaning, *Draughon*, 771 P.2d at 1108, it is clear that International has a duty to defend UP & L *only if* Federal's underlying policy is exhausted.

■ To determine whether the underlying insurance is exhausted, we must look to Federal's policy:

[T]he company shall have the right and duty to defend any suit against the insured ... but the company shall not be obliged to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

It is uncontroverted that Federal did not exhaust its $500,000 policy limit by paying a judgment or settlement in the *Carter* cases until the settlement was finally entered in March 1987 and the defense was concluded. Federal had tendered its policy limits for settlement earlier but UP & L declined to accept the tender, which constituted only a minor portion of the projected settlement amount, because it wanted to avoid piecemeal settlements and the appearance of bad faith in the settlement process. The district court held that Federal's unilateral effort to tender during the course of the litigation did not constitute exhaustion by payment of judgments or settlements, and therefore did not absolve Federal of its duty to defend. *Utah Power & Light*, 711 F.Supp. at 1552. Under these circumstances, we conclude that International did not have a duty to defend UP & L under its policy and that the district court's finding of an implied duty undermines these clear policy provisions.

■ Our analysis, however, does not end here. To support its claim that it may challenge the settlement, International invokes the rule that an insured who settles without its insurer's consent may be reimbursed only on a showing that the settlement was reasonable. *See United Servs. Auto. Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246, 253 (1987). The *Morris* rule is inapplicable in this case. The rule is drawn from contractual provisions that normally apply in primary insurance policies where the insurer has both the duty to defend and the attendant right to control the litigation. Such policies routinely require the insured

to cooperate with the insurer and prohibit the insured from entering a settlement agreement without the insurer's consent. *See e.g., Cay Divers, Inc. v. Raven,* 812 F.2d 866, 869–70 (3d Cir.1987). Because International's excess liability policy contained none of these provisions, it cannot rely on the *Morris* rule.

The only provision in the International policy that could support International's defense is CONDITION E which states in part that

> the company shall not be called upon to assume charge of the settlement or defense ... but the company shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve the company. In such event the insured and the company shall cooperate fully.

If International has a right to challenge the reasonableness of the settlement under this clause—a question we do not decide—it would arise only if UP & L had failed to associate International in the defense and control of the *Carter* cases.

The uncontroverted facts show that UP & L did not violate International's rights under this clause. UP & L sent International three litigation progress reports before mid–1986 when negotiations with the insurers began in earnest. From June 1986 through January 1987, UP & L hosted five meetings attended by International's representatives to discuss settlement of the *Carter* cases. From September through December 1986, UP & L made two written demands on International and the other Emery Insurers to contribute to a settlement pool. International agreed to contribute $3 million to the pool on the condition that UP & L contribute $1 million and the UP & L Insurers contribute the balance. UP & L agreed to contribute $1 million, but when no other insurers contributed International withdrew its offer. In December 1986, Federal tendered its policy limit of $500,000 and abandoned the defense of UP & L. UP & L then sought approval from International and the other insurers to set-

tle with its own resources. By late January 1987, when it was clear that settlement approval was not forthcoming, UP & L filed this declaratory judgment action.

In February 1987, International acknowledged the high risk of liability in the *Carter* cases and offered to contribute $4 million to the settlement. UP & L rejected the offer which it deemed to be too low and subject to unacceptable conditions regarding the pending declaratory judgment action. UP & L then reinstituted its demand that the Emery Insurers fund the settlement, and specifically demanded that International contribute its $10 million policy limit. On March 6, 1987, UP & L notified the insurers that it could no longer wait for the insurers to settle the cases because the window of opportunity for settlement was closing. It indicated that it would still prefer to have the insurers fund the settlement and resolve the declaratory judgment action, but if the insurers were unwilling to do so UP & L would fund the settlement itself and seek recovery through declaratory judgment. Having received no response from the Emery excess insurers by the March 11, 1987 deadline, UP & L accepted the plaintiffs' settlement offer on March 12. In a letter dated March 12 and received by UP & L on March 13, International tendered its $10 million policy limit to UP & L to fund the settlement. Throughout these months of negotiation, International never disputed the amount of the settlement.

The uncontroverted facts indicate that UP & L never violated its duty to cooperate with International nor International's right to associate in the defense and control of the *Carter* action. We therefore affirm the district court's ruling that International is barred from contesting the reasonableness of the settlement amount.

## IV.

The Emery Insurers, with the exception of Federal, challenge the district court's summary judgment ruling that the UP & L Insurers' other insurance clauses [2] prevail

---

**2.** In general, an "other insurance" clause is an    insurance contract provision designed to avoid

over the Emery Insurers' clauses, leaving the Emery Insurers primarily liable for coverage of the *Carter* settlement. Because the Emery Insurers' coverage is sufficient to cover the entire cost of the *Carter* settlement, this ruling allows the UP & L Insurers to escape responsibility for covering the cost of the *Carter* settlement.

The only facts material to this issue involve the language of the competing other insurance clauses. Because the language of those clauses is not in dispute, the sole issue is whether the district court correctly applied Utah law. The Emery Insurers contend that the district court could not have applied Utah law properly because there is no relevant Utah case law, and so the district court should have looked to the law in other jurisdictions for guidance. Because we conclude that the Utah Supreme Court has addressed this issue, we reject these arguments.

■ The language of an insurance policy "should be construed pursuant to the same rules as are applied to other ordinary contracts." *Bergera*, 524 P.2d at 600. During this inquiry, we must construe the policy language according to its plain and ordinary meaning. *Draughon,* 771 P.2d at 1108. Utah courts follow this same course when construing competing other insurance clauses. *See, e.g., Globe Indem. Co. v. Western Casualty & Sur. Co.*, 523 P.2d 858, 860–61 (Utah 1974) ("The language of the policies relieve the plaintiffs from any obligation to defend or indemnify the [insureds]."); *Russell v. Paulson*, 18 Utah 2d 157, 417 P.2d 658, 663 (1966) (Crockett, J., concurring) ("The first essential in such cases is to examine the policies with care and to give effect to their language and intent."). We therefore turn to the precise language of the other insurance clauses.

St. Paul's other insurance clause provides as follows:

> With respect to a loss covered hereunder, if the Insured has other insurance, whether on a primary, excess or contin-

gent basis, there shall be no insurance afforded hereunder as respects such loss; provided, that if the applicable limit of liability of this Policy is greater than the applicable limit of liability provided by the other insurance, this Policy shall afford excess insurance over and above such other insurance in an amount sufficient to give the Insured, as respects the layer of coverage afforded by this Policy, a total limit of liability equal to the applicable limit of liability afforded by this Policy.

Both the Allianz and the Cal Union policies incorporate by reference St. Paul's other insurance clause. Thus, all of the UP & L Insurers employ the St. Paul clause.

International's other insurance clause provides as follows:

> If other collectible insurance including other insurance with this company is available to the insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit of liability hereunder) the insurance hereunder shall be in excess of and not contribute with such other insurance.

The Twin City and First State policies incorporate by reference International's other insurance clause. The First State policy also contains its own other insurance clause:

> If other valid and collectible insurance with any other Insurer is available to the Insured covering a loss also covered by this Policy, other than insurance that is in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such insurance.

Thus, all of the Emery Insurers employ the International clause, and First State also employs its own, similar clause.

■ We find that the language of these competing other insurance clauses clearly and unambiguously establishes a hierarchy of coverage. St. Paul's clause is triggered

liability for an insurer "by declaring either that another insurer provides primary coverage or that the insurance contract containing the clause provides no coverage when another in-

surance coverage applies to the loss." Robert E. Keeton & Alan L. Widiss, Insurance Law § 3.11, at 254 (1988).

by the existence of "other insurance, whether on a primary, excess or contingent basis." Because the Emery Insurers provide UP & L with other insurance within the meaning of St. Paul's clause, they cannot and do not deny that their insurance triggers St. Paul's other insurance clause.

In contrast, International's clause is triggered by other insurance *with the exception of* "insurance purchased to apply in excess of the sum of the retained limit of liability" provided by the Emery Insurers' respective policies. Thus, while St. Paul's clause expressly *includes* other excess insurance as a trigger, International's clause expressly *excludes* other excess insurance as a trigger. The coverage provided by the UP & L Insurers clearly constitutes "insurance purchased to apply in excess" of the coverage provided by the Emery Insurers. Because St. Paul's other insurance clause is triggered, the UP & L Insurers' coverage operates only as insurance in excess of the Emery Insurers' coverage. Therefore the UP & L Insurers' coverage does not trigger International's other insurance clause.

First State's own other insurance clause operates in a fashion similar to International's clause. It is triggered by insurance "other than insurance that is in excess of the insurance" afforded by First State. First State's clause thus also expressly excludes other excess insurance as a trigger. Therefore, even if First State were to invoke its own clause rather than the International clause that its policy incorporates by reference, we would find that the coverage provided by the UP & L Insurers does not trigger First State's clause.[3]

Because we find that the UP & L Insurer's coverage does not trigger the International and First State other insurance clauses, we conclude that the Emery Insurers' policies provide primary coverage relative to the UP & L Insurers. And because we find that the Emery Insurers' coverage does trigger St. · Paul's other insurance clause, we conclude that the UP & L Insurers' coverage is in excess of the coverage afforded by the Emery Insurers.

The Emery Insurers ask us to disregard the plain language of the other insurance clauses and instead adopt on Utah's behalf one of two rules that have been adopted by other jurisdictions. They first invite us to adopt the majority rule that "excess" clauses, such as International's, always trump "escape" and "excess-escape" clauses, such as St. Paul's. *See, e.g., Insurance Co. of N. Am. v. Continental Casualty Co.,* 575 F.2d 1070 (3d Cir.1978) (applying Pennsylvania law).[4] In the alternative, they ask us to adopt the minority rule that where other insurance clauses are in direct conflict, neither should be given effect and the loss should be pro-rated between the two insurers. *See, e.g., Lamb–Weston, Inc. v. Oregon Auto. Ins. Co.,* 219 Or. 110, 341 P.2d 110 (1959).

We reject these invitations because both rules are contrary to Utah law. The Utah courts do not simply categorize other insurance clauses as excess, pro-rata, escape, or excess-escape clauses and apply presump-

---

**3.** The court in *Offshore Logistics Services, Inc. v. Mutual Marine Office, Inc.,* 462 F.Supp. 485 (E.D.La.1978), *aff'd as noted in* 639 F.2d 1168 (5th Cir. Unit A 1981), reached a similar conclusion after analyzing the plain language of an other insurance clause similar to the International and First State clauses. In that case, the clause provided that "[t]his policy is excess over other valid and collectible insurance, except for policies in excess of the limits of liability provided under this policy." *Id.* at 493. The court denied effect to the clause because the competing policy, by virtue of its own other insurance clause, provided only excess insurance, thus falling within the exception. *Id.* at 494.

**4.** Other insurance clauses fall into three general categories:

(1) excess clauses, which limit the insurer's liability to that in excess of any liability covered under other available insurance; (2) pro rata clauses, which limit the insurer's liability to its pro rata share of the loss in the proportion that its policy limits bears to the aggregate of available liability coverage; and (3) escape clauses, which provide indemnity only in the event that other liability insurance is unavailable.

*State Farm Mut. Auto. Ins. Co. v. United States Fidelity & Guar. Co.,* 490 F.2d 407, 410 (4th Cir.1974); *see also Keeton & Widiss* § 3.11(a) at 253. International and First State's clauses fall into the general category of excess clauses. St. Paul's clause is a hybrid excess-escape clause.

tive rules that one type trumps another. Rather, as we discuss above, they give effect to the plain meaning of the clauses' language. Thus, the Utah Supreme Court recognizes the general validity of excess-escape clauses, *see, e.g., Clark v. State Farm Mut. Auto. Ins. Co.*, 743 P.2d 1227, 1230 (Utah 1987); *Lyon v. Hartford Accident & Indem. Co.*, 25 Utah 2d 311, 480 P.2d 739, 741–42 (1971) *overruled on other grounds by Beck v. Farmers Ins. Exch.*, 701 P.2d 795 (Utah 1985), because the plain language of these clauses generally prevails over the language of other types of clauses, *see Russell*, 417 P.2d at 660–62; *id.* at 663 (Crockett, J., concurring). More importantly, the *Globe* court interpreted the plain language of an excess-escape clause to prevail over the plain language of an excess clause. *See* 523 P.2d at 860–861.[5] Although courts in other jurisdictions may have found good reason to disfavor escape and excess-escape clauses, the Utah Supreme Court has not followed their lead. After the Supreme Court's decision in *Erie Railway Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "it should go without saying that a federal court applying state law cannot change that state law; nor can the federal court ignore the state's law and adopt a different approach, no matter how honored that approach may be." *Pound v. Insurance Co. of N. Am.*, 439 F.2d 1059, 1063 (10th Cir. 1971).

For the same reasons, we decline to apply the minority rule to this case. Although the Utah Supreme Court has indicated that the rule might be appropriate when other insurance clauses are in direct conflict, it has not expressly adopted the rule. *See Russell*, 417 P.2d at 660–61 (dis-

cussing *Lamb–Weston* ). Even if we were to adopt the rule today, it would have no application here because, as we find above, the other insurance clauses involved in this case are not in direct conflict.

Because we find that the district court correctly held that St. Paul's other insurance clause prevails over the International and First State clauses as a matter of law, we affirm its order granting summary judgment in favor of UP & L and the UP & L Insurers on the other insurance issue.

### V.

Finally, International argues that the district court erred in granting A & A's motion for summary judgment on International's negligence claim. It is uncontroverted that A & A is a wholesale broker who acted as an intermediary between Emery's retail broker of record and International's managing general agent, London. As wholesale broker, A & A took applications prepared by Emery's retail broker to the insurance market to obtain quotes according to Emery's bid specifications. A & A then submitted a bid to Emery's retail broker. London acted, pursuant to an Agency–Company Agreement, as International's authorized agent in underwriting the Emery account and binding International to coverage for Emery. No such agency agreement existed between A & A and International, and the Brokerage Agreement between A & A and London states that A & A "is not the agent of, and has no authority to bind LONDON AGENCY or any of its principals."

In its Third Amended Complaint, International alleged that a "fiduciary relationship" existed between A & A and Interna-

---

**5.** Although the reasoning in *Globe* is somewhat cryptic, a brief review of the cases it cites in support of its conclusion demonstrates that the Utah Supreme Court would not adopt a general rule that excess clauses trump escape and excess-escape clauses. *See id.* at 861 n. 1 (citing *Indiana Lumbermen's Mut. Ins. Co. v. Mitchell*, 409 F.2d 392 (7th Cir.1969); *Allstate Ins. Co. v. Shelby Mut. Ins. Co.*, 269 N.C. 341, 152 S.E.2d 436 (1967); *Government Employees Ins. Co. v. Lumbermen's Mut. Casualty Co.*, 269 N.C. 354, 152 S.E.2d 445 (1967); *Faltersack v. Vanden Boogaard*, 39 Wis.2d 64, 158 N.W.2d 322 (1968)).

In each of those cases, the courts held that when the loss could be covered in full by a policy with an excess clause, other insurance provided by policies with either escape or excess-escape clauses was not "collectible" insurance that would trigger the competing excess insurance clause. Therefore, the insurers that issued the policies with the untriggered excess clauses were liable for the whole loss. *See Mitchell*, 409 F.2d at 394–95; *Allstate*, 152 S.E.2d at 443; *Government Employees*, 152 S.E.2d at 447; *Faltersack*, 158 N.W.2d at 324.

tional which imposed on A & A "a duty of prompt, full and frank disclosure of all matters known or which reasonably should have been known to Alexander & Alexander." It further alleged that A & A "failed to exercise that degree of care, knowledge and diligence required of insurance agents and brokers" by failing to adequately investigate—and making negligent misrepresentations regarding—UP & L's role in the ownership and operation of the Wilberg Mine, the relationship between UP & L and Emery, and International's potential risks under the policy. International claimed that, had it been aware of the true nature of the risks, it would have either declined to renew the policy or materially altered the coverage or premiums. In its Memorandum in Opposition to Alexander & Alexander's Motion for Summary Judgment, International stated that its "claim is not one for negligent misrepresentation, but rather is a professional malpractice claim based upon a number of separate failures by Alexander & Alexander to conform its conduct to that required of insurance brokers in like circumstances."

The district court found elements of both negligent misrepresentation and breach of duty of care claims in the complaint and addressed both issues. It held that: (1) International was unable to establish at least one element of a negligent misrepresentation claim—reasonable reliance—as a matter of law because it had actual knowledge of the facts alleged to have been misrepresented; and (2) in the absence of an agency relationship, A & A owed International no affirmative duty other than a general duty not to make material misrepresentations or omissions, and that even if a duty existed, International was equitably estopped from pursuing a negligence claim because it had actual notice of the facts it claimed to lack because of A & A's alleged breach. International does not appeal the question of negligent misrepresentation. We therefore restrict our decision to the breach of a duty of care claim.

**6.** A & A and London entered into a Brokerage Agreement under which London promised to

It is axiomatic that one may not be liable in negligence absent a duty, and "[t]he question of whether a duty exists is a question of law." *Loveland v. Orem City Corp.*, 746 P.2d 763, 765–66 (Utah 1987). International cites to a number of cases for the propositions that insurance brokers owe insurers a duty of disclosure, a fiduciary duty to deal honestly and openly, and a duty to ask the questions stated on the application form and to disclose pertinent facts in preparing the application. We find that these cases fail to support International's claim against A & A because they either involve misrepresentation claims, *see e.g., Auto–Owners Ins. Co. v. Johnson, Rast & Hays Ins.*, 820 F.2d 380 (11th Cir.1987), or recognize duties that are predicated on the existence of an agency relationship, *see e.g., Wood v. Old Sec. Life Ins. Co.*, 643 F.2d 1209 (5th Cir.1981); *United Equitable Life Ins. Co. v. Trans Global Corp.*, 679 F.Supp. 769 (N.D.Ill. 1988); *Hays v. Farm Bureau Mut. Ins. Co.*, 225 Kan. 205, 589 P.2d 579 (1979). Because International has not appealed its negligent misrepresentation claim, and has conceded that no agency relationship existed between International and A & A, we find no basis for International's claim in these cases.

International argues on appeal that, even absent an agency relationship, A & A owed it an affirmative duty which arises out of a contractual relationship for the performance of services. *See DCR Inc. v. Peak Alarm Co.*, 663 P.2d 433 (Utah 1983). In *Peak Alarm*, the parties entered a contract for installation and maintenance of a burglar alarm system by the defendant. The court found that "contractual relationships for the performance of services imposes on each of the contracting parties a general duty of due care toward the other, apart from the specific obligations expressed in the contract itself." *Id.* at 435. International has failed, however, to allege that a contractual relationship for the performance of services exists between it and A & A, nor has it provided any evidence of such a contractual relationship.[6] Because

"exert its best efforts to place with an insurer, or insurers, such risks as it may be called upon by

International has not alleged facts sufficient to establish that A & A owed it a duty to investigate, we affirm the district court's grant of summary judgment.

AFFIRMED.

[A & A] to place." On its face, it does not establish a contractual relationship between A & A and International, and International does not allege otherwise.