59 F.3d 178
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Andrew C. KING and Mining and Energy Resources, Inc.,
Plaintiffs-Appellants,
v.
NEVADA ELECTRIC INVESTMENT COMPANY,
Defendant-Third-Party-Plaintiff-Appellee,
v.
Leonard WITKOWSKI, Third-Party-Defendant.
 No. 94-4122.
 D.C. No. 91-CV-351
 United States Court of Appeals, Tenth Circuit.
 June 21, 1995.
 ORDER AND JUDGMENT[1]
 
 1
 Before SEYMOUR and BARRETT, Circuit Judges, and DAUGHERTY*, District Judge.
 
 
 2
 Andrew C. King (King) and Mining and Energy Resources, Inc. (MERI), collectively referred to as appellants, appeal from the orders of the district court granting summary judgment in favor of Nevada Electric Investment Company (NEICO).
 
 Facts
 
 3
 MERI is a Colorado corporation. King is a fifty percent owner and the vice-president of MERI. Leonard Witkowski (Witkowski) is a fifty percent owner and the president of MERI. Both King and Witkowski hold degrees in mining engineering and are experienced in the coal mining industry. At all relevant times hereto, King and Witkowski were the only directors, shareholders and employees of MERI.
 
 
 4
 NEICO is a wholly owned subsidiary of Nevada Power Company (NPC).
 
 
 5
 In the mid-1980's, the Genwal Coal Company (Genwal), owned by the Gent family, operated an active coal mine (the Genwal Mine) on federal lands in Crandall Canyon, Emery County, Utah. The Genwal Mine had coal reserves of exceptionally high quality; however, the reserves were of insufficient quantity to sustain the mine for any appreciable period of time.
 
 
 6
 NEICO held four sections of Utah state land under lease which contained significant, high quality coal reserves. Although the leases were titled to NEICO, the majority owner of the leases was the California Department of Water Resources (CDWR), which had requested that its equity interest not be disclosed. Two of the state sections were within reasonable proximity to the Genwal Mine. Although these sections, standing alone, were not mineable without considerable and perhaps prohibitive cost, they were accessible through an extension of the Genwal Mine.
 
 
 7
 Certain unleased federal coal reserves bridged the gap between the Genwal Mine and the state leases and were likewise accessible through an extension of the Genwal Mine.
 
 
 8
 On March 6, 1986, MERI obtained an option to purchase the Genwal Mine from the Gent family. On June 7, 1986, MERI entered into a lease option agreement with NEICO to acquire the state leases. Under Section 5 of that agreement, NEICO agreed to share with MERI all assay data and other information it had or may acquire relating to the state leases. However, NEICO failed to provide MERI with a copy of the Savage Study, a 1985 study prepared for NEICO to determine its alternatives in disposing of the central Utah coal fields it controlled. NEICO also failed to disclose that CDWR had an equity interest in the leases.[2]
 
 
 9
 Notwithstanding section 5, King and Witkowski conducted their own reserve calculations and valuations of the state leases. Although they were permitted to conduct further exploration on the leases, they declined to do so, because "[w]e felt pretty comfortable with the reserve...." (Appellants' Appendix at 304). The lease option agreement was extended in 1986 and 1987 based upon additional option payments of $7,000 and $11,000, respectively, both of which were paid by Genwal. The lease option required MERI to pay an advance minimum royalty of $50,000 on or before June 7, 1988, if it decided to exercise the option.
 
 
 10
 In early 1988, NEICO approached MERI and related that it was interested in acquiring the Genwal Mine and the state leases (the combined properties being referred to by the parties as "the coal property package") which MERI had under option. On March 25, 1988, MERI presented NEICO with a proposal which contemplated a MERI/NEICO joint ownership of the coal property package with MERI operating the mine on a contract basis.
 
 
 11
 In the weeks that followed, NEICO declined to enter into a joint venture with MERI as a part owner. On May 17, 1988, King and Witkowski met with NEICO officials at NPC's Las Vegas, Nevada, offices. At the beginning of the meeting, King and Witkowski were given a letter from NEICO which stated, inter alia, that: it planned to acquire Genwal; it recognized that MERI was in a unique position to negotiate a purchase agreement with the Genwal Mine owners and "we would like you to use your best efforts to represent us in this capacity," (Appellants' Appendix at 75); NEICO would pay MERI $15,000 when MERI assigned to NEICO all of its rights and interests in its option to purchase the Genwal Mine; NEICO would negotiate in good faith with MERI to conclude a mine management and sales agreement under which MERI would operate the mine and act as a sales agent for Genwal coal; the agreement would take effect upon the closing of the option agreement and would provide, among other things, for MERI to receive a finder's fee of $185,000, payable in installments together with additional compensation, as agreed upon, for the management and operation of the mine.
 
 
 12
 The meeting ended without an agreement. "We had not settled on the two hundred thousand dollar finder's fee and we had not agreed that MERI would look solely to the mine management agreement for the recovery of its three to four million dollars [the amount of money which King and Witkowski believed would be a fair return to MERI for its efforts]. (Appellants' Appendix at 956). "Further there had been no indication of a desire to eliminate Witkowski.... The meeting terminated without resolution of our differences." Id.
 
 
 13
 On June 5, 1988, MERI obtained a new option (the new option) to purchase the Genwal Mine for $4,000,000, with a provision that MERI could assign it to an undisclosed third party, which MERI intended to be NEICO. Id. at 40. The new option was scheduled to expire on June 12, 1988, unless extended by a $500,000 payment to Genwal.
 
 
 14
 MERI did not exercise the state lease option by paying NEICO the advance minimum royalty of $50,000 on or before June 7, 1988. Rather, on June 7, 1988, NEICO and MERI executed an agreement which provided, inter alia:
 
 
 15
 A. MERI holds an option to acquire certain State of Utah coal leases owned by NEICO pursuant to an Option Agreement....
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 D. NEICO desires to retain its coal leases now under option to MERI if NEICO acquires GENWAL.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 THEREFORE, in consideration of the mutual promises and covenants of NEICO and MERI arising from the joint efforts to acquire GENWAL for NEICO, the parties agree as follows:
 
 
 22
 1) MERI will allow the Option Agreement to expire ... and not exercise its rights thereunder....
 
 
 23
 2) In the event that NEICO does not acquire GENWAL ... NEICO will renew the Option Agreement to MERI....
 
 
 24
 (Appellants' Appendix at 105).
 
 
 25
 On June 8, 1988, NEICO wrote MERI a letter "to set forth a working agreement under which each of us will proceed with the necessary tasks leading toward a purchase of Genwal stock or assets." Id. at 107. The letter provided, inter alia:
 
 
 26
 2. You have executed ... [an] Option and Agreement for the Acquisition of Stock of Genwal (Option Agreement).... You will assign the Option Agreement to us, and thereupon we will pay you $15,000 for fees and expenses incurred in connection with your obtaining the Option Agreement.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 4. Upon closing of the Option Agreement by NEICO or its nominee purchasing all the stock of GENWAL, NEICO will pay to MERI a finder's fee of $185,000 at time of closing.
 
 
 30
 5. During the Option Period, NEICO and Andy King, in his individual capacity and unrelated to his capacity with MERI, will negotiate in good faith to conclude a Mine Management Agreement (MINE AGREEMENT) under which Andy King will operate the GENWAL mine for us. The MINE AGREEMENT would take effect upon closing of the Option Agreement by NEICO or its nominee purchasing all the stock of GENWAL. Either party may terminate the MINE AGREEMENT for any reason, at its option, at any time. At time of termination, Mr. King will be paid whatever is owed under the MINE AGREEMENT.
 
 
 31
 (Appellants' Appendix at 107.)
 
 
 32
 The June 8, 1988, letter was agreed to by King, personally, and as vice president of MERI. Pursuant to the letter, MERI assigned the new option to NEICO. NEICO paid MERI $15,000 and "other valuable consideration" for the new option. Id. at 109. Thereafter, NEICO paid Genwal $500,000 to extend the new option.
 
 
 33
 On December 22, 1988, NEICO exercised the new option to acquire the Genwal Mine. NEICO paid MERI the $185,000 finder's fee due under the June 8, 1988, letter. Thereafter, King was employed as the manager of the Genwal Mine. On October 4, 1989, King was terminated. At the time of King's termination, NEICO and King had not executed a mine management agreement.
 
 Litigation
 
 34
 Appellants filed their initial complaint on April 5, 1991, alleging, inter alia, that NEICO had breached its agreement to negotiate in good faith with King to conclude a mine management agreement. Appellants sought damages under theories of breach of contract, promissory estoppel, and breach of duty of good faith and fair dealing.
 
 
 35
 On July 1, 1991, NEICO sold an undivided one-half interest in the coal property package to Intermountain Power Agency (IPA).
 
 
 36
 On July 28, 1992, appellants filed a second amended complaint, containing six counts, in which they alleged that: they had transferred their interests in the Genwal Mine option and the state lease option to NEICO, based on NEICO's false representations that it would negotiate in good faith a mine management agreement; NEICO breached the state lease option and its implied covenant of good faith and fair dealing by failing to provide MERI studies it held relating to the state leases and by misrepresenting that it held clear title to the leases; NEICO breached its contractual duty to negotiate a mine management agreement; NEICO breached its duty of good faith and fair dealing to MERI; NEICO had breached its duty of good faith and fair dealing to appellants; and NEICO was barred from denying the enforceability of its promise to negotiate in good faith a mine management agreement by the doctrine of promissory estoppel.
 
 
 37
 NEICO moved for summary judgment on the fraud claims and contract claims.
 
 
 38
 On December 18, 1992, the district court entered an order granting NEICO's motions for summary judgment on: Count I, appellants' fraud and deceit claim [with summary judgment being granted only on MERI's claims]; Count II, MERI's fraud and deceit claim; Count III, appellants' breach of contract claim; Count IV, MERI's breach of duty of good faith and fair dealing claim; and Count V, appellants' breach of duty of good faith and fair dealing claim.
 
 
 39
 The court denied NEICO's motion for summary on Count VI, appellants' promissory estoppel claim. However, on April 26, 1993, the district court entered an order granting NEICO's renewed motion for summary judgment on appellants' promissory estoppel claim contained in Count VI.
 
 
 40
 Thereafter, NEICO moved for summary judgment on King's fraud claim, the only remaining claim. King conceded in his response brief that "[i]f the court concludes that it appropriately ruled on the promissory estoppel claim ... then Plaintiff must state that the Court should grant Defendant's motion." (Plaintiff King's Response at 22). On March 11, 1994, the district court granted NEICO's motion for summary judgment on King's fraud claim.
 
 
 41
 On April 11, 1994, the district court entered judgment in favor of NEICO and dismissed appellants' second amended complaint, revised, with prejudice.
 
 Issues
 
 42
 On appeal, appellants contend that the district court: (1) misstated and/or misapplied the law and disregarded their evidence and legal theory in evaluating and dismissing MERI's fraud claim, (2) erred in refusing to allow them to amend their complaint, (3) erred in concluding that MERI failed to provide evidence of harm or the amount of damage sustained, (4) erred in concluding, sua sponte, that appellants' reliance was unreasonable, and (5) erred in refusing to consider a restitution remedy under promissory estoppel.
 
 Standards on Appeal
 
 43
 Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the district court's grant of summary judgment de novo, applying the same standards as the district court. Thrifty Rent-A-Car v. Brown Flight Rental One, 24 F.3d 1190, 1194 (10th Cir.1994).
 
 
 44
 In diversity cases governed by state law, such as here, we must ascertain and apply state law so as to reach the same result that the state court would reach. Utah Power & Light Co. v. Federal Insurance Co., 983 F.2d 1549, 1553 (10th Cir.1993). Our review of the district court's applications of state law is de novo. Salve Regina College v. Russell, 499 U.S. 225, 231 (1991). "If [a] court of appeals finds that the district court's analytical sophistication and research have exhausted the state-law inquiry, little more need be said in the appellate opinion. Independent review, however, does not admit of unreflective reliance on a lower court's inarticulable intuitions." Id. at 232-33. Thus, an appropriately respectful application of de novo review should encourage a district court to explicate with care the basis for its legal conclusions." Id.
 
 Disposition
 I.
 
 45
 Appellants contend that the district court misstated and/or misapplied the law and disregarded their evidence and legal theory in evaluating and dismissing MERI's fraud claim.
 
 
 46
 In Turner v. General Adjustment Bureau, Inc., 832 P.2d 62, 66 (Utah App.), cert. denied, 843 P.2d 1042 (Utah 1992), the court set forth the elements of fraud:
 
 
 47
 To establish fraud, a party must prove by clear and convincing evidence each of the following elements: (1) a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to that party's injury and damage.
 
 
 48
 In Count II, MERI alleged that NEICO had defrauded it by failing to disclose all information relevant to the state leases and by denying it the benefit of a mine management agreement after NEICO received the full benefit of the coal property package. Appellants contend that the court erroneously granted NEICO's motion for summary judgment on Count II on the basis that MERI was not a real party in interest and that MERI had failed to establish any misrepresentation, reliance, or resulting injury.
 
 
 49
 NEICO responds that the district court properly granted summary judgment against MERI on each of its fraud claims based on MERI's failure to establish the essential elements of its claims under Utah law.
 
 
 50
 In granting NEICO summary judgment on MERI's fraud claims, the district court found/concluded, inter alia:
 
 
 51
 [H]owever, plaintiffs have failed to present any affirmative evidence of material misrepresentations made to MERI by NEICO.... Instead the evidence established MERI was a part of the negotiations until things changed at or shortly after the May 17, 1988 meeting. Thereafter the deal was struck with King. Neither King nor MERI was forced to conclude the deal with NEICO under the terms of the June 8, 1988 Letter Agreement, rather each did so voluntarily, knowing the terms specifically excluded MERI.
 
 
 52
 .... In the instant case MERI was specifically excluded from the deal. All parties knew that NEICO was unwilling to go any further with MERI after the May 17, 1988 meeting and that if any deal was to be struck, it would be with King alone, in his individual capacity, just as the language of the Letter Agreement indicates. King knew it, and so did Witkowski/MERI and the plaintiffs apparently consented to the express terms, as evidenced by the signatures on the agreements.
 
 
 53
 * * *
 
 
 54
 * * *
 
 
 55
 Regarding NEICO's intent to disclose all relevant information pursuant to the terms of the [state leases] Option Agreement, MERI alleges there was a present intent to defraud at the time the agreement was originally signed....
 
 
 56
 * * *
 
 
 57
 * * *
 
 
 58
 To prevail on its fraud claims, MERI must prove, among other things, not only a misrepresentation, but that the misrepresentation was material and that it was made with the present intent to defraud, and further, that there was resultant injury. The court has difficulty finding sufficient evidence of each of these elements in connection with the Option Agreement. In particular, while MERI has provided some argument concerning the damage it believes it suffered as a result of NEICO's failure to provide ... information, the court simply did not find the alleged omissions and or misrepresentations to be material or to have caused injury in the legal sense .... mere conjecture or speculation about what could have been if defendant had conducted the negotiations differently, absent more compelling evidence, are insufficient to allow MERI to proceed with its fraud claim as it relates to the Option Agreement.
 
 
 59
 (Appellants' Appendix at 543-44, 547, 549).
 
 
 60
 We hold that district court properly applied Turner in granting NEICO's motion for summary judgment on MERI's fraud claims based on its findings/conclusions that MERI had failed to establish the elements of a fraud claim. Significantly, the court's critical findings that MERI "was specifically excluded from the deal" and that "if any deal was to be struck, it would be with King alone, in his individual capacity," are supported by King's undisputed deposition testimony:
 
 
 61
 Q. [Mr. Rampton, Attorney for Appellee]: At that time [May 26, 1988] who was the mine management contract going to be with?
 
 
 62
 * * *
 
 
 63
 * * *
 
 
 64
 A. [Andrew King]: Myself.
 
 
 65
 Q. Not MERI.
 
 
 66
 A. No.
 
 
 67
 Q. Not Mr. Witkowski?
 
 
 68
 A. No.
 
 
 69
 Q. Just with Andy King?
 
 
 70
 A. Correct.
 
 
 71
 * * *
 
 
 72
 * * *
 
 
 73
 Q. Well, how was Len Witkowski going to fit into this deal if the mine management contract was with you?
 
 
 74
 A. After the 17th meeting [May 17, 1988], they became upset with Len and his distrust of them changing the agreement and things like that and they did not want to deal with Len. And Bob [Bob Mower, NPC] told me the only reason that we're going to restructure it for you is that they did not want to deal with Len Witkowski. And I said to them, that's fine. Len and I have worked together and he will receive his portion of the money through me if you only want to deal with me. And I said, you know, as long as that's the case, that fine. And he said, oh, they just don't want to deal with Len. And I said, Len and I have worked together long enough that I'll work on this deal myself and we'll take care of Len through our personal relationship.
 
 
 75
 (Appellee's Supplemental Appendix [King Deposition] at 32-34).
 
 II.
 
 76
 Appellants contend that the district court erred in refusing to allow them to amend their complaint.
 
 
 77
 Under Fed. R..Civ. P. 15(a) "leave [to amend] shall be freely given when justice requires." The grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971); Clayton v. Tansy, 26 F.3d 980, 982 (10th Cir.1993). "Refusing leave to amend is generally only justified upon a showing of undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or undue prejudice to the opposing party, or futility of amendment, etc." Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir.1993).
 
 
 78
 Appellants filed their initial complaint on April 5, 1991, alleging that NEICO had breached the June 8, 1988, letter agreement to negotiate in good faith with King to conclude a mine management agreement. Appellants filed an amended complaint on December 17, 1991, alleging that King and MERI were fraudulently induced to accept and agree to the June 8, 1988, letter agreement. Appellants filed a second amended complaint on March 24, 1992, raising an additional breach of contract claim. Appellants filed a "second amended complaint, revised" (third amended complaint) on July 28, 1992, raising additional allegations of fraud and deceit. NEICO stipulated to the filing of the second amended complaint, revised, making it the operative pleading.
 
 
 79
 On April 2, 1993, after the district court's order of December 18, 1992, granting summary judgment in favor of NEICO on five of appellants' counts, leaving only appellants' promissory estoppel claims and King's individual fraud claim, appellants filed a motion to amend their second amended complaint, revised (fourth amended complaint). While positing their amendment as one "designed to conform Plaintiffs' complaint to the manner in which their claims have been briefed, argued and supported by affidavits, depositions or exhibits on file," (Appellants' Appendix at 797), appellants acknowledged that their "amendment to their complaint [was] by way of clarification, adding nothing that has not been extensively briefed and argued, with the exception of the unjust enrichment claim," and that "[t]his claim is in direct response to the Court's Memorandum Decision [of January 22, 1993, granting summary judgment in favor of NEICO]." Id. at 831-32. The district court denied appellants' motion via a minute order.
 
 
 80
 We hold that the district court did not abuse its discretion in denying appellants' fourth amended complaint, inasmuch as appellants acknowledge that the complaint "add[ed] nothing" to that which had been extensively briefed and argued," but rather, was filed in response to the district court's decision and order granting summary judgment in favor of NEICO.
 
 III.
 
 81
 Appellants contend that the district court erred in concluding that MERI failed to provide evidence of the fact of harm or the amount of damage sustained. This contention assumes that MERI had a viable fraud claim. It did not:
 
 
 82
 ... the evidence established MERI was part of the negotiations until things changed at or shortly after the May 17, 1988 meeting. Thereafter the deal was struck with King. Neither King nor MERI was forced to conclude the deal with NEICO under the terms of the June 8, 1988 Letter Agreement, rather each did so voluntarily, knowing the terms specifically excluded MERI.
 
 
 83
 (Appellants' Appendix [Memorandum Decision and Order] at 543-44).
 
 
 84
 Therefore, we hold that appellants' claim is without merit.
 
 IV.
 
 85
 Appellants contend that the district court erred in concluding, sua sponte, that their reliance was unreasonable and in refusing to consider a restitution remedy under promissory estoppel.
 
 
 86
 "Promissory estoppel is an equitable claim for relief which is normally tried to the bench." Andreason v. Aetna Casualty & Surety Co., 848 P.2d 171, 174 (Utah App.1993). The necessary elements of promissory estoppel in Utah include: a promise reasonably expected to induce reliance; reasonable reliance inducing action or forbearance on the part of the promissee or a third person; and detriment to the promissee or third person. Id. at 174-75. The factual prerequisites for promissory estoppel are:
 
 
 87
 that the defendants were aware of all the material facts; that in such awareness they made the promise when they knew that the plaintiff was acting in reliance on it; that the latter, observing reasonable care and prudence, acted in reliance on the promise and got into a position where it suffered a loss.
 
 
 88
 Tolboe Construction v. Staker Paving & Construction, 682 P.2d 843, 845-46 (Utah, 1984)
 
 
 89
 In Count VI, appellants alleged "Plaintiffs ceased efforts to negotiate a joint venture with third parties upon NEICO's representation that it would negotiate such an arrangement with Plaintiffs; and then later, NEICO induced Plaintiffs to assign and relinquish in favor of NEICO their controlling position as to the Genwal Mine and the State Leases by promising Plaintiffs that NEICO would negotiate in good faith to conclude a Mine Agreement."
 
 
 90
 (Appellants Appendix at 59).
 
 
 91
 In granting NEICO's motion for summary judgment on appellants' promissory estoppel claims, the district court found/concluded, inter alia:
 
 
 92
 Plaintiff's promissory estoppel claims involve two issues: The contemplated joint venture ... and the promise to negotiate the mine management agreement....
 
 
 93
 * * *
 
 
 94
 * * *
 
 
 95
 As the court has noted before, and as we have verified by plaintiffs' evidence ... any reliance on a proposed joint venture arrangement was unreasonable after the fallout from the May 17 meeting. Thereafter all parties were on notice that the terms being offered by NEICO had changed and that there would be no joint venture arrangement....
 
 
 96
 * * *
 
 
 97
 * * *
 
 
 98
 Furthermore, the evidence presented by plaintiffs establishes that all negotiations with third parties, particularly those which they allege NEICO was aware of, were terminated prior to the March meeting where an alleged joint venture between plaintiffs and NEICO was first proposed. Thus the court cannot find that anything NEICO said or did affected third party negotiations.
 
 
 99
 Regarding the mine management agreement .... [o]nce again the court has focused on whether there was a definite and certain promise on which plaintiffs could reasonably rely.
 
 
 100
 The evidence establishes that when the relationship of the parties changed at or shortly after the May 17th meeting, King and Witkowski were aware that the deal, if done at all, would be done with King alone, not with MERI and not with Witkowski....
 
 
 101
 Plaintiffs' evidence on this point, combined with the language of the Letter Agreement, leads to but one conclusion, that the parties' relationship and expectations and the terms of the deal were uncertain, unspecified and constantly changing. The testimony excerpts cited by plaintiffs are evidence of an uncertain and indefinite promise and the unreasonableness of their reliance on Mower's assurances, without more.
 
 
 102
 The court cites to one troubling example. Throughout ... plaintiffs' evidence has referred to their expectations of receiving three to four million dollars through the mine management agreement. There is a significant difference, in the Court's view, between the three and four million dollars.
 
 
 103
 .... a difference of at least one million dollars is hard to gloss over and reflects indefiniteness and casualness on all parts.
 
 
 104
 (Appellee's Supplemental Appendix at 3-6).
 
 
 105
 Based on the above conclusions, the district court specifically concluded that "the promises at issue were not definite and certain, nor, in particular, was plaintiffs' reliance reasonable nor their actions reasonable under the circumstances." Id. at 7.
 
 
 106
 Appellants failed to establish a promise, reasonable reliance on a promise, or resulting detriment with respect to the joint venture or mine management agreement. Under these circumstances, we hold that the district court did not err in granting NEICO's motion for summary judgment on appellants' promissory estoppel claims set forth in Count VI.
 
 
 107
 AFFIRMED.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 *
 The Honorable Frederick A. Daugherty, Senior United States District Court Judge for the Northern, Eastern and Western Districts of Oklahoma, sitting by designation
 
 
 [2]
 NEICO subsequently acquired CDWR's equitable interest in the leases